2017 CO 40

**Angelo Emilio MONTOYA, Petitioner,**

v.

**The PEOPLE of the State of Colorado, Respondent.**

**Supreme Court Case No. 12SC832**

Supreme Court of Colorado.

May 15, 2017

Attorneys for Petitioner: Douglas K. Wilson, Public Defender, Elizabeth Griffin, Deputy Public Defender, Denver, Colorado

Attorneys for Respondent: Cynthia H. Coffman, Attorney General, John T. Lee, Assistant Attorney General, Denver, Colorado

JUSTICE COATS delivered the Opinion of the Court.

¶1 Montoya petitioned for review of the court of appeals' judgment affirming his convictions for attempted extreme indifference murder, reckless manslaughter, criminally negligent homicide, and accessory to crime. See People v. Montoya, No. 06CA1875, 2012 WL 4009870 (Colo. App. Sept. 13, 2012). Montoya and his cousin were tried together for the shooting death of a woman at a party, in the course of which they each fired a number of rounds in the direction of other party-goers. In a separate appeal to the court of appeals, Montoya's homicide convictions were initially reversed for failure to properly instruct concerning self-defense against multiple assailants, but upon remand for reconsideration in light of intervening supreme court jurisprudence, all of his convictions were affirmed, not only with regard to the disputed issue of multiple assailants but against a variety of other assignments of error as well. Montoya's subsequent petition for a writ of certiorari was partially granted by this court.

¶2 Because there was sufficient evidence to support Montoya's conviction of attempted extreme indifference murder; because Montoya was barred from challenging on appeal the sufficiency of the evidence supporting his conviction for being an accessory to crime, a lesser non-included offense presented to the jury at his request; and because Montoya's simultaneous convictions of reckless manslaughter and accessory to crime neither merged nor required concurrent sentences, the judgment of the court of appeals is affirmed.

## I.

¶3 Angelo Montoya and his cousin were charged by grand jury indictment with extreme indifference murder in the shooting death of a young woman at a party.[1] The two were tried together, and although both were acquitted of the charged offense of extreme indifference murder, they were each convicted of attempted extreme indifference mur-

---

1. The indictment also charged Montoya with the attempted extreme indifference murder of another man at the party who was injured by gunshot. Montoya was acquitted of that charge, and it therefore was not involved in his appeals.

der, reckless manslaughter, criminally negligent homicide, and accessory to crime, all of which had been submitted to the jury as lesser offenses of the charged offense. Montoya was sentenced to concurrent terms of imprisonment of forty-eight years for attempted extreme indifference murder, the maximum sentence in the aggravated range for a class two felony, six years for reckless manslaughter, and three years for criminally negligent homicide, and to a consecutive term of six years for accessory to crime.

¶4 Evidence at the trial indicated that on the night of October 23–24, 2004, Montoya and his cousin were attending a large keg party at a house in Wheat Ridge. At some point, after Montoya and his friends were told to leave, a fight erupted, guns were produced, and Montoya and his friends were chased from the house. While running for his cousin's car, Montoya fired a number of rounds from a nine-millimeter Glock semi-automatic handgun. While Montoya drove the car away, his cousin fired more rounds toward the house from the same handgun. The crime scene evidence indicated that ten shots were fired from the Glock, one of which penetrated a bedroom window in the house, striking a young woman, who was pronounced dead later that morning.

¶5 As pertinent to the issues before this court, the jury was instructed on the elements of the charged homicide offense of extreme indifference murder and also concerning the principles of complicitor liability for aiding, abetting, advising, or encouraging another in the commission of a crime. With regard to the offense of extreme indifference murder, the jury was further instructed as to the circumstances in which a person would be justified in using force in his own defense, and in that regard it was instructed that it could consider whether the defendant was justifiably acting in self-defense in assessing whether he caused the death of another under circumstances evidencing an attitude of universal malice manifesting extreme indifference to the value of human life generally. Over the objection of defense counsel, the jury was not, however, instructed that self-defense was an affirmative defense to the crime of extreme indifference murder, which

the prosecutor would then bear the burden of separately disproving beyond a reasonable doubt.

¶6 In addition, the jury was instructed on the elements of the crime of attempting to commit extreme indifference murder and that if it were not satisfied beyond a reasonable doubt that the defendant was guilty of extreme indifference murder, he could nonetheless be convicted of the lesser included offense of attempting to commit extreme indifference murder. The jury was expressly instructed, however, that it could not find the defendant guilty of both the extreme indifference murder and the attempted extreme indifference murder of the same victim. The jury was further instructed on the elements of reckless manslaughter, its lesser included offense of attempted reckless manslaughter, and criminally negligent homicide, as lesser offenses of extreme indifference murder, but the jury was not similarly instructed that it could not find the defendant guilty of these homicide offenses if it found him guilty of either extreme indifference murder or attempted extreme indifference murder. Finally, at the request of the defendant, the jury was instructed on the elements of the offense of accessory to crime, as a lesser non-included offense of the charged offense.

¶7 The jury returned guilty verdicts for the offenses of attempted extreme indifference murder, reckless manslaughter, criminally negligent homicide, and accessory to crime with regard to both men, and the court entered judgment of conviction and sentenced the defendants on each of those verdicts. Each defendant appealed separately to the court of appeals. The intermediate appellate court initially ordered that Montoya's conviction for accessory to crime be affirmed but that his homicide convictions be reversed, finding that he was erroneously denied an instruction concerning the right to act in self-defense against multiple assailants. Summarily, following this court's intervening clarification of the right to a multiple-assailant instruction in Riley v. People, 266 P.3d 1089 (Colo. 2011), the People's petition for writ of certiorari was granted, the judgment of the court of appeals was vacated, and the case was remanded for reconsideration. On re-

mand, all of Montoya's convictions and sentences were affirmed against all of his assignments of error.

¶8 Following remand and the affirmance of his convictions, we partially granted Montoya's petition for a writ of certiorari, agreeing to consider the viability of separate convictions for being both a complicitor and an accessory to the same crime, as well as restructuring his petition to consider the sufficiency of the evidence to support his convictions for attempted extreme indifference murder, reckless manslaughter,[2] and accessory to crime.

## II.

¶9 Under the general rubric of sufficiency, Montoya raises several different but related arguments, challenging the court of appeals' understanding of the elements of extreme indifference murder, as defined by statute; the adequacy, in terms of both quantity and quality, of the evidence actually presented at trial to support his conviction of attempted extreme indifference murder; and the constitutionality of convicting him of attempted extreme indifference murder without requiring the prosecution to disprove his claim of self-defense, in addition to proving beyond a reasonable doubt the elements defining that offense. While it is at least questionable whether all of these arguments are clearly included within the issues structured for review by this court, they have all been fully briefed and argued by the parties, and given their interrelation and the difficulty they apparently continue to pose for the lower courts of the jurisdiction, we consider it important to address each and explain why none undermines the jury verdict finding Montoya guilty of attempted extreme indifference murder.

¶10 First, Montoya asserts that the culpable mental state of "knowingly" in the definition of the crime of extreme indifference murder applies not only to the circumstances and nature of his conduct but also to the result of that conduct, such that he could be found guilty of attempting to commit extreme indifference murder only if there was sufficient evidence to prove that he engaged in conduct strongly corroborative of his firmness of purpose to knowingly cause the death of another, with an awareness of both the nature of his conduct and the circumstances under which it must statutorily have been engaged in. Second, he asserts that in light of these requirements, there was insufficient evidence presented at trial to support his conviction of attempted extreme indifference murder. And finally, he asserts that in addition to the statutorily prescribed elements of the offense of attempted extreme indifference murder, the prosecution was also required to prove beyond a reasonable doubt that his attempt to kill the victim was not justified as an act of self-defense, and in this regard he asserts that were the prosecution not relieved of its burden of proof in violation of due process of law, there would not have been sufficient evidence to disprove his assertion of self-defense.

## A.

■ ¶11 As we have recounted in much greater detail elsewhere, the form of homicide in this jurisdiction now referred to as extreme indifference murder has undergone considerable evolution, in both case law and legislation, in reaching its current state. See People v. Jefferson, 748 P.2d 1223, 1226–30 (Colo. 1988); see also Candelaria v. People, 148 P.3d 178, 180–83 (Colo. 2006). The statutory offense, which is defined at section 18-3-102(1)(d) of the revised statutes, was struck down by this court in 1981 for being insufficiently distinguishable from, but nevertheless punished more severely than, the knowing homicide offense of second degree murder. People v. Marcy, 628 P.2d 69 (Colo. 1981); see also People v. Curtis, 627 P.2d 734, 736 (Colo. 1981) (applying Marcy and reversing the defendant's extreme indifference murder

---

**2.** In arguments before this court, Montoya offers no challenge to the sufficiency of the evidence to support his conviction for reckless manslaughter: Additionally, while Montoya indicates in his briefing that reckless manslaughter and criminally negligent homicide should have been submitted to the jury as lesser included offenses of attempted extreme indifference murder, the question whether his reckless manslaughter conviction should merge with his attempted extreme indifference murder conviction was not raised to this court.

conviction); People v. Lee, 630 P.2d 583, 587–88 (Colo. 1981) (same); People v. Gurule, 628 P.2d 99, 102 (Colo. 1981) (same). Following amendment by the legislature, we upheld the successor statute, understanding it to create a crime of greater social consequence than second degree murder by proscribing killing acts of a particularly heinous nature, rather than by attempting to carve out a new and intermediate culpable mental state between knowledge and intent. Jefferson, 748 P.2d 1223. In doing so, we therefore made clear that the required mental state for extreme indifference murder, as with the crime of second degree murder, remained simply "knowingly." See id. at 1232.

¶12 The culpable mental state "knowingly" is statutorily defined in terms of its applicability to a result of conduct, as well as to its applicability to the conduct itself or to a circumstance described by a statute defining an offense. See § 18-1-501(6), C.R.S. (2016). With respect to the former, a person acts "knowingly" when he is aware that his conduct is practically certain to cause the result. Id. With respect to the latter, a person acts "knowingly" when he is aware that his conduct is of such nature or that such circumstance exists. Id. The legislature has expressly indicated that when a statute defining an offense prescribes as an element thereof a specified culpable mental state, that mental state is deemed to apply to every element of the offense unless an intent to limit its application clearly appears. § 18-1-503(4), C.R.S. (2016). The legislature has also expressly indicated that where acting knowingly suffices to establish an element of an offense, that element is equally established if the person acts intentionally, or with a conscious objective to cause the proscribed result. §§ 18-1-501(5), -503(3).

¶13 Unlike second degree murder, which describes the proscribed conduct solely in terms of its result, see § 18-3-103(1), C.R.S. (2016) ("knowingly causes the death of a person"), extreme indifference murder describes the proscribed conduct, in addition to specifying certain required attendant circumstances, both in terms of its nature and its result, see § 18-3-102(1)(d) ("knowingly engages in conduct which creates a grave risk of death to a person, or persons, other than himself, and thereby causes the death of another"). The nature and result of the conduct proscribed in extreme indifference murder appear in two verb clauses, conjoined in a single sentence and governed by the same subject—"he," referring to the defendant. See § 18-3-102(1)(d) ("he knowingly engages ... and ... causes"). The question whether the adverb "knowingly," clearly modifying the first verb, "engages," does not also modify the second verb, "causes," as it does in second degree murder, therefore turns on whether "an intent to limit its application clearly appears." See § 18-1-503(4). While perhaps not dispositive in itself, it can at least be said with confidence that such an intent to limit the application of the mental state "knowingly" would more clearly appear if the statute required that the death simply result from the conduct engaged in by the defendant rather than requiring, as it does, that the death be caused by the defendant.

¶14 While we expressly found the mental state of "intentionally" inapplicable to the second verb clause in a very similarly worded incarnation of extreme indifference murder pre-dating the statute we struck down in Marcy, see People v. Castro, 657 P.2d 932, 938 (Colo. 1983), overruled on other grounds by West v. People, 2015 CO 5, 341 P.3d 520, in Marcy we found the then-extant statute, in which the mental state "knowingly" had been substituted for "intentionally," to require the defendant's awareness that his conduct was practically certain to result in another's death, Marcy, 628 P.2d at 77–78. We did so in Marcy, however, for a somewhat different reason. Without expressly addressing the question whether the mental state "knowingly" was intended to modify the second verb clause—"and thereby causes the death of another"—we found that "[i]n the context of criminal homicide, conduct that is practically certain to cause the death of another is the semantic equivalent of conduct creating a grave risk of death to another." Id. at 79. In upholding the post-Marcy, amended version of the extreme indifference murder statute in Jefferson, we did not find fault with this equivalence drawn in Marcy, but rather upheld the amended statute solely on the basis

of its distinguishable conduct, or <u>actus reus</u>. See <u>Jefferson</u>, 748 P.2d at 1232–33.

¶15 Furthermore, in reasoning as we did in <u>Jefferson</u>, we consistently described both second degree murder and extreme indifference murder as proscribing "knowing, killing conduct," the latter offense being distinguished from the former by containing "an element <u>in addition to</u> those required" for the former. <u>Id.</u> at 1233 (emphasis added). Perhaps even more emphatically, in <u>Candelaria</u>, 148 P.3d at 182, we characterized <u>Jefferson</u> as concluding that extreme indifference murder had become distinguishable from second degree murder <u>only</u> in the sense that the actual killing act had to be one objectively demonstrating a willingness to take life indiscriminately. Finally, we found there to have been sufficient evidence of extreme indifference murder in <u>Candelaria</u> precisely for the reason that the jury could find from the trial evidence that the defendant and his companions "were aware their shooting was practically certain to cause death and was carried out under circumstances evidencing a willingness to take the lives of others without knowing or caring who they were." <u>Id.</u> at 183.

¶16 Whether or not the same conclusion could be reached solely from the legislature's direction in section 18-1-503(3) for understanding its intent concerning the breadth of application of a mental state included in the definition of a crime, we have at least never deviated from the reasoning of <u>Marcy</u> that conduct practically certain to cause the death of another is the equivalent of conduct creating a grave risk of death to another. It therefore follows that knowingly engaging in the latter conduct and thereby causing the death of a person or persons is the equivalent of knowingly causing the death of another. While conviction of extreme indifference murder therefore requires proof that the defendant was practically certain his conduct would cause death, or in other words, that he

was knowingly engaging in conduct creating a grave risk of death to another, proof that Montoya knowingly caused death was not required where the jury returned a guilty verdict of only <u>attempted</u> extreme indifference murder. Rather, the jury was required to find, in this regard, only that Montoya knowingly engaged in conduct strongly corroborative of his purpose to commit the crime of extreme indifference murder.

¶17 It is now well-settled, and not challenged here, that attempt liability in this jurisdiction does not require a specific intent, or conscious objective to accomplish a proscribed result, and instead attaches to crimes requiring merely knowledge with regard to the conduct, circumstances, or result defining the crime in question, see <u>People v. Krovarz</u>, 697 P.2d 378, 383 (Colo. 1985) ("We hold that a culpable mental state of knowledge suffices to support criminal attempt liability."), and even to crimes of recklessness, see <u>People v. Thomas</u>, 729 P.2d 972, 976–77 (Colo. 1986) (finding that the index-of-dangerousness approach of <u>Krovarz</u> leads to the same result reached in <u>Thomas</u>, with regard to crimes of recklessness, and <u>Castro</u>, with regard to crimes of extreme indifference).[3] For conviction of attempted extreme indifference murder, as attempt liability has been construed to exist in this jurisdiction, there must be evidence from which a trier of fact can find that the actor was aware he was engaging in conduct strongly corroborative of the firmness of his purpose to complete the commission of the crime of extreme indifference murder, see § 18-2-101(1), C.R.S. (2016) (defining criminal attempt); see also <u>People v. Lehnert</u>, 163 P.3d 1111, 1113 (Colo. 2007); and commission of the crime of extreme indifference murder would be complete only if the defendant caused the death of another by knowingly engaging in conduct creating a grave risk of death to a person or persons

---

3. Although we have previously explained the basis for upholding attempt liability for extreme indifference murder, in <u>Castro</u> we did so with regard to the pre-<u>Marcy</u> statute, which we construed not to make the mens rea applicable to the proscribed result of death at all, 657 P.2d at 938, and in <u>People v. Ramos</u>, although we dealt with the current extreme indifference murder statute, our judgment there pre-dated <u>Jefferson</u>

and did not involve a challenge to either the constitutionality or construction of the new statute, see 708 P.2d 1347, 1353 (Colo. 1985) (Lohr, J., specially concurring). Accordingly, attempt liability attaches to the current crime of extreme indifference murder to the extent we found it applicable to crimes requiring a mental state of "knowingly" in <u>Krovarz</u>.

other than himself—meaning that he was practically certain his conduct would cause the death of another—under circumstances evidencing an attitude of universal malice manifesting extreme indifference to the value of human life generally.

¶18 Further, where the trier of fact is permitted to find the defendant legally accountable for the behavior of another constituting an attempt to commit extreme indifference murder, by reason of his aiding, abetting, advising, or encouraging the other person in planning or committing that attempt, with the intent to promote or facilitate it, there must merely be evidence from which the trier of fact can find that the defendant was legally accountable for the behavior of another actor and either the defendant or the other actor engaged in conduct strongly corroborative of the firmness of his purpose to complete the commission of the crime of extreme indifference murder. See § 18-1-603, C.R.S. (2016) (defining complicity liability); see also People v. Childress, 2015 CO 65M, ¶ 34, 363 P.3d 155, 165, as modified on denial of reh'g (Jan. 11, 2016).

### B.

¶19 For more than four decades we have held there to be sufficient evidence to support a conviction if "the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of a charge beyond a reasonable doubt." People v. Bennett, 183 Colo. 125, 515 P.2d 466, 469 (1973); see also Jackson v. Virginia, 443 U.S. 307, 313–20, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (recounting history of similar federal standard); Clark v. People, 232 P.3d 1287, 1292 (Colo. 2010) (rejecting requirement that under substantial evidence standard the prosecution must "exclude every reasonable hypotheses other than that of guilt" or disprove the defendant's theory (quoting Bennett, 515 P.2d at 469)). Although the testimony at trial was often inconsistent or in conflict, it was for the jury to decide which evidence to credit and how much weight to assign that evidence, in light of all the admitted evidence, both direct and circumstantial.

¶20 According to this standard, there was an abundance of evidence from which the jury could find that Montoya was accountable for the commission of attempted extreme indifference murder. The jury was presented with both real and testimonial evidence, which, if credited, would clearly establish that both Montoya and his cousin, acting in concert, each in turn fired five rounds from the same semi-automatic handgun, indiscriminately, in the direction of a house, full of party-goers, from which the pair was being pursued. Consciously firing a lethal firearm a number of times into a crowd of people is clearly conduct from which a fact finder could reasonably determine that the shooters were at least aware they were creating a grave risk of death or, in other words, were practically certain they would cause death, if not that they were actually acting with a conscious objective to cause death.

¶21 By the same token, consciously but indiscriminately shooting into a crowd of people presents a quintessential example of circumstances evidencing a willingness to take life indiscriminately and therefore, in the language of the statute, evidencing universal malice manifesting extreme indifference to the value of human life generally. With regard to conduct, result, and circumstances, we have previously found that shooting a number of times into a car containing a number of passengers, in retaliation against one of them, was sufficient evidence from which to find the shooters were practically certain they were engaging in conduct that would cause death, under circumstances satisfying the elements of extreme indifference murder. Candelaria, 148 P.3d at 183. Although there was arguably sufficient evidence for the jury to have found Montoya guilty of extreme indifference murder itself, either because it was one of the rounds actually fired by him that struck the victim or because he was complicit in the commission of the killing committed by his cousin, where the jury returned a guilty verdict only with regard to attempt liability, assigning responsibility for performing the actual killing act was unnecessary.

## C.

¶22 Montoya asserts, however, that in addition to the elements of the crime of attempted extreme indifference murder, as extreme indifference murder and attempt liability are defined by statute in this jurisdiction, the prosecution bore the burden of proving beyond a reasonable doubt that he, or presumably an actor for whose behavior he was accountable, did not act in self-defense; that the prosecution was relieved of this burden, in violation of the dictates of due process of law; and that being the case, there was insufficient evidence to satisfy this additional element. Montoya's assertion is premised on his understanding that our opinion in People v. Pickering, 276 P.3d 553 (Colo. 2011), permitted his conviction of attempted extreme indifference murder without requiring the prosecution to prove that his use of physical force in killing the victim was not justified in defense of himself or a third person, according to section 18-1-704, C.R.S. (2016), and that by doing so, our opinion in Pickering violates due process of law, as that doctrine was applied to the proof of affirmative defenses by the United States Supreme Court in Smith v. United States, 568 U.S. 106, 133 S.Ct. 714, 184 L.Ed.2d 570 (2013). Montoya's reasoning in this regard appears to stem from a misreading of both Smith and Pickering.

¶23 Notwithstanding the prosecution's clear constitutional obligation to prove beyond a reasonable doubt every fact necessary to constitute the crime with which a defendant is charged, see In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the Supreme Court has long held that proof of the nonexistence of all affirmative defenses has never been constitutionally required, see Patterson v. New York, 432 U.S. 197, 210, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). Should the matter have remained in any doubt, in Smith, while actually holding that due process was not violated by requiring the defendant in that case to shoulder the burden of proving his affirmative defense of withdrawal from a conspiracy, the Supreme Court noted that the Government has no constitutional duty to overcome beyond a reasonable doubt a defense that excuses oth-

erwise punishable conduct, as long as that defense does not also controvert any of the elements of the offense itself; and, conversely, that the prosecution is only foreclosed from shifting the burden of proof to the defendant when an affirmative defense does negate an element of the crime. See 133 S.Ct. at 719.

¶24 Whatever questions may remain in federal law concerning precisely when an affirmative defense "controverts," or "does negate" an element of an offense, long before the federal constitution was construed to impose limitations on the common law rule requiring criminal defendants to prove affirmative defenses, we in this jurisdiction interpreted the state due process clause to do so. See People ex rel. Juhan v. Dist. Court, 165 Colo. 253, 439 P.2d 741 (1968) (deviating from the Supreme Court's interpretation of the federal due process clause in Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), with regard to proof of insanity, and interpreting our own due process clause to require the prosecution to disprove insanity). For nearly a half-century, any question about the reach of our own constitutional limitation in this regard has been rendered largely inconsequential, as is the case in most states, by statute. Since its enactment, effective in 1972, the Colorado Criminal Code has mandated that issues involved in affirmative defenses, once raised, must be proved beyond a reasonable doubt by the prosecution, just as with the other elements of the offense. § 18-1-407, C.R.S. (2016).

¶25 In 2003, in response to various case law developments, the General Assembly amended its statutory provision recognizing a legal justification for using force in defense of one's person, or self-defense. Ch. 83, sec. 1, § 18-1-704, 2003 Colo. Sess. Laws 795. Over a period of years, we had distinguished defenses operating by negating, or "traversing," the elements of a charged crime, from defenses operating by excusing, authorizing, or justifying in some manner, conduct that would otherwise constitute the commission of that crime, see, e.g., People v. Huckleberry, 768 P.2d 1235, 1238–39 (Colo. 1989) (distinguishing defenses in the nature of traverses from affirmative defenses, and holding that a

defense of alibi constitutes the former); and with regard to self-defense, in particular, we had found it unnecessary to provide an affirmative defense instruction for charges of using physical force recklessly or with criminal negligence, despite the defendant's having produced some credible evidence of acting in self-defense, see, e.g., Case v. People, 774 P.2d 866 (Colo. 1989) (holding that the trial court was not required to provide jury with an affirmative self-defense instruction because it had properly instructed the jury on reckless manslaughter and criminally negligent homicide); People v. Fink, 194 Colo. 516, 574 P.2d 81, 83 (1978), superseded by statute in part, Ch. 83, sec. 1, § 18-1-704, 2003 Colo. Sess. Laws 795, as recognized in Pickering, 276 P.3d at 556 (stating that, "[w]hen an element of the crime charged is that the defendant acted in a reckless or criminally negligent manner, and the trial court properly instructs the jury as to each element, no error results from the court's failure to give a self-defense instruction"). In those cases, we reasoned that acting with these culpable mental states would be inconsistent with acting reasonably, a prerequisite for self-defense; and therefore rather than finding section 18-1-704 to impose a burden to disprove legal justification in addition to proving the elements of a crime of recklessness or criminal negligence, we held that the prosecution effectively disproves a claim of self-defense to a charge of acting recklessly or with criminal negligence by simply proving the elements of the crime itself. As we explained in Pickering, the 2003 statutory amendment codified our requirement that a defendant nevertheless be permitted to present evidence that he was acting in self-defense, even in cases in which he would not be entitled to an instruction imposing an additional burden on the prosecution to disprove an affirmative defense of legal justification. 276 P.3d at 556. Moreover, the amendment added a requirement that in those situations, the jury not only be instructed as to the law governing

self-defense but also that it be notified that evidence of acting in self-defense could be taken into account in determining whether the defendant acted recklessly, with extreme indifference,[4] or in a criminally negligent manner. Id. In codifying the requirements for those cases in which self-defense operates to traverse the elements rather than provide legal justification or excuse for the use of otherwise proscribed physical force, we noted, however, that the General Assembly had made clear that the instruction it intended for the former type of defense not be an affirmative defense instruction, for the simple reason that unlike the latter, with regard to the former there is no legal justification or excuse to be disproved. See id. at 556–57.

¶26 In Pickering we addressed the question whether instructing the jury that the prosecution did not bear a burden to disprove self-defense with regard to the charge of reckless manslaughter conveyed to the jury the misimpression that the prosecution was somehow absolved of its burden, of which the jury had been separately and expressly instructed in its elemental instruction, to prove beyond a reasonable doubt that the defendant acted recklessly in causing the death of the victim. Relying heavily on Supreme Court jurisprudence holding that even an instruction squarely placing the burden on a criminal defendant to prove a defense that may negate an element of the charge could nevertheless not have the effect of unconstitutionally shifting to the defendant a burden of disproving any element of the state's case, see Martin v. Ohio, 480 U.S. 228, 233–34, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987) (holding that placing on the defendant the burden to prove her assertion of self-defense by a preponderance of the evidence did not convey any shift in the State's burden to prove beyond a reasonable doubt all of the elements of aggravated murder), we found that merely instructing the jury to the effect that the prosecution did not bear a burden to dis-

---

4. While this court had never determined that the affirmative defense of self-defense would be inconsistent with engaging in conduct under circumstances evidencing universal malice manifesting an extreme indifference to the value of human life generally, the court of appeals had done so in published opinions prior to the 2003

amendment. See, e.g., People v. Fernandez, 883 P.2d 491, 493 (Colo. App. 1994) (relying on the rationale in Fink, 574 P.2d 81, to find that, "the charge of extreme indifference murder is inconsistent with the affirmative defense of self-defense").

prove self-defense with regard to reckless manslaughter did not improperly shift the burden to prove recklessness in that case, and we overruled two court of appeals' cases holding otherwise, Pickering, 276 P.3d at 556–57 (overruling People v. Lara, 224 P.3d 388 (Colo. App. 2009) and People v. Taylor, 230 P.3d 1227 (Colo. App. 2009)).

▮ ¶27 Specifically, Montoya asserts here that when we stated in Pickering, in substantially the language of the statute, that the prosecution does not bear a burden to disprove self-defense when it has been asserted as a defense to crimes of recklessness, extreme indifference, or criminal negligence, we effectively ruled that the prosecution need not disprove an element-negating defense, despite a federal due process mandate that it do so. Initially, neither Smith, nor any of the Supreme Court's jurisprudence preceding it, even remotely suggests that federal due process requires a state to disprove an element-negating defense, in any manner other than merely proving those elements of the crime that would be negated by that defense. Smith merely addresses, and largely restates, Supreme Court jurisprudence specifying when the burden of proof concerning an affirmative defense may, and when it may not, be shifted to the criminal defendant asserting the defense. See 133 S.Ct. at 718–20. Smith nowhere purports to address the circumstances, or particular kinds of instructions, that might be understood to shift the prosecution's burden to prove the elements of the offense with which the defendant is charged, nor does the Court retreat from its holding in Martin, upon which we relied in Pickering. Martin squarely held that even unequivocally placing a burden on the criminal defendant to prove self-defense by a preponderance of the evidence could not have had the effect of relieving the prosecution of its burden to prove the elements of the homicide crime with which she was charged. 480 U.S. at 235–36, 107 S.Ct. 1098.

▮ ¶28 Of equal importance, however, Montoya simply misreads both the 2003 amendment and our opinion in Pickering. Section 18-1-704 provides legal justification for using physical force in defense of one's person, under specified circumstances, and section 18-1-710 designates that legal justification, for what would otherwise be punishable conduct, an affirmative defense. Subsection (4) of section 704, added in 2003, expressly addresses the situation "in which the defendant is not entitled to a jury instruction regarding self-defense as an affirmative defense," (emphasis added), and with regard to that situation, the amendment nevertheless entitles the defendant to present evidence that he or she was acting in self-defense and to have the jury instructed on self-defense law, including the relevance of that law to the jury's resolution of the question whether the defendant in fact acted recklessly, with extreme indifference, or in a criminally negligent manner. By simply clarifying that in this limited situation, "the prosecuting attorney shall not have the burden of disproving self-defense," the statute cannot reasonably be understood to relieve the prosecution of its burden to prove all the statutory elements of the offense, including any element of the offense that would be traversed by the defendant's acting in self-defense. In the clear context of the subsection as a whole, it can only be understood to mean that where proof of the crime at issue necessarily establishes that the defendant did not act in self-defense, as is the case with crimes of extreme indifference, recklessness, or criminal negligence, the prosecution bears no separate, or additional, burden with regard to self-defense, as it would with regard to an affirmative defense of legal justification or excuse.

▮ ¶29 By the same token, our exegesis of the 2003 amendment to section 18-1-704 in Pickering, as well as our holding there that a carrying instruction using the language of section 18-1-704(4) is not unconstitutionally erroneous, cannot be reasonably understood as relieving the prosecution of a burden to disprove an element-negating defense, as Montoya asserts. Quite the contrary, our entire rationale in Pickering is premised on the well-established proposition that a defense operating solely by traversing, or negating, elements of the crime itself is disproved, at one and the same time, by proving those elements. See, e.g., Huckleberry, 768 P.2d at

1238–39 (holding that a defense of alibi does not merit an affirmative defense instruction because proof that the defendant committed the crime itself necessarily disproves the defendant's assertion that he was somewhere else). The question before us in Pickering was simply whether instructing the jury that the prosecution did not bear a burden of disproving self-defense with regard to the crime of reckless manslaughter could be expected to convey to the jury, contrary to all its other instructions, that the defendant, rather than the prosecution, bore the burden of proof as to the element of causing death recklessly, and we found that it could not.

¶30 In the instant case, unlike in Pickering, the defendant was not charged with, and the jury was not instructed concerning, any other offense for which self-defense could operate as a legal justification or excuse. In this case, unlike Pickering, it was therefore unnecessary to distinguish for the jury the prosecution's burden of proof relative to legal justification or excuse from its burden relative to a traverse, or element-negating defense. Consequently, unlike in Pickering, the jury below was never instructed that the prosecution did not bear a burden to disprove self-defense, and therefore the jury was never provided with an instruction as to which any suggestion of shifting or relieving the prosecution of its burden might even colorably be asserted. In the absence of instructional error, Montoya is left with no more than the assertion that the prosecution failed to produce sufficient evidence to disprove self-defense. Because there was sufficient evidence, as we have already made clear, for the jury to reasonably find all of the elements of the crime of attempted extreme indifference murder, there was necessarily sufficient evidence to disprove Montoya's claim that he acted reasonably, in self-defense.

### III.

¶31 Montoya also asserts a number of different but related claims under the rubric of sufficiency of the evidence, challenging his conviction for being an accessory to crime. Because, however, Montoya expressly made the tactical choice to request that the charge of accessory to crime be added to the existing charges against him and submitted to the jury, as is permitted in this jurisdiction, in the hope that the jury would convict him of that lesser offense in lieu of the homicide itself, he is effectively estopped from asserting on appeal that, notwithstanding his representation at trial, there was actually insufficient evidence to reach the jury and support conviction of that charge.

¶32 Although the practice is clearly not required by the federal constitution, and has in fact been criticized by the Supreme Court as injecting a "kind of distortion" into the trial process by permitting consideration of a charge the prosecution did not even attempt to prove, see Hopkins v. Reeves, 524 U.S. 88, 99, 118 S.Ct. 1895, 141 L.Ed.2d 76 (1998), we continue to entitle a criminal defendant in this jurisdiction to have the jury presented with the option to convict of a lesser non-included offense, as long as a rational basis exists to simultaneously acquit of the charged offense and convict of that lesser offense, People v. Rivera, 186 Colo. 24, 525 P.2d 431, 434 (1974); People v. Aragon, 653 P.2d 715, 720 n.5 (Colo. 1982). In adopting this policy, we feared that juries might convict of a greater crime if they lacked the option to convict of a lesser crime they actually believed to have been proved by the evidence, whether included in the charged offense or not, and we opined that allowing defendants to offer juries such an option, at their choice, would insure better trials and fairer verdicts. See Rivera, 525 P.2d at 434. Both at the time and since, we have recognized that permitting a jury to convict of an offense neither charged nor included in a charged offense would be tantamount to adding a charge against the defendant, and therefore such a procedure could be permissible only as a tactical and strategic choice made by defense counsel. See Rivera, 525 P.2d at 434; Arko v. People, 183 P.3d 555, 558–59 (Colo. 2008).

¶33 The policy considerations supporting the various doctrines limiting a party from changing its position on appeal are too obvious and well-accepted to merit great discussion. We have expressly characterized the

doctrine of invited error as a species of the equitable doctrine of estoppel, and more narrowly as a "cardinal rule of appellate review ... prevent[ing] a party from inducing an inappropriate or erroneous [ruling] and then later seeking to profit from that error." See Horton v. Suthers, 43 P.3d 611, 618 (Colo. 2002) (second alteration in original) (quoting Roberts v. Consolidation Coal Co., 208 W.Va. 218, 539 S.E.2d 478, 488 (2000)); see also People v. Zapata, 779 P.2d 1307, 1309 (Colo. 1989) ("[A] party may not complain on appeal of an error that he has invited or injected into the case; he must abide by the consequences of his acts."); United States v. Rodebaugh, 798 F.3d 1281, 1304 (10th Cir. 2015) (invited error doctrine "precludes a party from arguing [on appeal] against a proposition it willingly adopted [at trial]"). With regard to instructing the jury, in particular, we have found on multiple occasions that a party is precluded from arguing instructional error on appeal at least when the instruction at issue was requested by that party. See, e.g., People v. Gross, 2012 CO 60M, ¶¶ 8–12, 287 P.3d 105, 109–10; Zapata, 779 P.2d at 1308–10; Gray v. People, 139 Colo. 583, 342 P.2d 627, 630 (1959); cf. Hansen v. State Farm Mut. Auto. Ins. Co., 957 P.2d 1380, 1385 (Colo. 1998) (holding that invited error barred the defendant from challenging on appeal the trial court's failure to give a particular instruction where defense counsel actively participated in the jury instruction conference, was notified by the trial court of its concerns with the defense's proposed version of that instruction, and expressly declined to redraft the instruction).

¶34 Whether or not a meaningful distinction could be made, for some purpose, between challenging a lesser offense instruction as unsupported by the evidence and challenging a guilty verdict on the lesser offense thus presented, as unsupported by the evidence, in either case, the error, if any, would have been invited equally by a defendant asserting his entitlement to have the jury presented with the option to convict him of an offense less serious than the one with which he was charged. Because a trial court may only instruct the jury on a lesser non-included offense if there is some evidence in the record to rationally support conviction

for that offense, Aragon, 653 P.2d at 720 n.5, a defendant who requests instruction on such an offense necessarily represents to the trial court that the evidence rationally supports conviction for the offense, a position that would be wholly contradicted by the defendant's later argument on appeal that the evidence supporting conviction for this offense is insufficient, see Bennett, 515 P.2d at 469. The rationale supporting the preclusive effect of invited error can no more permit a criminal defendant to challenge a jury's ability to convict him of an offense he has invited it to consider than it can permit him to request a tactically advantageous instruction and then assert the trial court has reversibly erred by granting his request.

¶35 Nor does the constitutional requirement that the prosecution prove the elements of a crime beyond a reasonable doubt foreclose a criminal defendant's loss of the right to demand such proof, as a result of his own conduct. In Jackson v. Virginia, although the Supreme Court broadly upheld a criminal defendant's right to challenge the sufficiency of a state conviction by motion for writ of habeas corpus, it there determined only the standard of sufficiency required by the federal due process clause. 443 U.S. at 318–20, 99 S.Ct. 2781. It did not consider, and did not purport in any way to alter, the impact of preclusive doctrines like forfeiture, estoppel, or waiver on a criminal defendant's right to assert a claim of insufficient evidence following his conviction.

¶36 Quite the contrary, it is widely-accepted for example, even after Jackson, that by entering a guilty plea a defendant waives his right to insist that the prosecution establish his guilt beyond a reasonable doubt. See, e.g., Patton v. People, 35 P.3d 124, 128 (Colo. 2001); Smith v. McCotter, 786 F.2d 697, 702–03 (5th Cir. 1986) (reaffirming the holding of Kelley v. Alabama, 636 F.2d 1082, 1083–84 (5th Cir. 1981), to the effect that "[t]he Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), mandate that sufficient evidence exist from which a rational fact finder could find guilt beyond a reasonable doubt is inapplicable to convictions based on a guilty plea"). Just as the

Supreme Court's holding in Jackson does not preclude a defendant's waiver of his right to challenge the sufficiency of the evidence supporting his conviction, neither does it preclude him from being estopped, as the result of his taking a contrary position in the trial court, from doing so. A criminal defendant's due process right to insist that there be substantial evidence supporting a conviction is therefore not violated by forbidding him from taking a position on appeal contrary to the one he successfully urged upon the trial court.

¶37 In addition to portending nothing about the due process implications of accepting a criminal defendant's concession of sufficient evidence at trial, it is abundantly clear that the Supreme Court in Jackson implied nothing about a criminal defendant's ability to challenge as erroneous his own representations in requesting that a lesser non-included offense be presented to the jury, for the simple reason that such a request is not sanctioned by the federal constitution at all.

## IV.

■ ¶38 Finally, separate and apart from the sufficiency of the evidence to convict him of being an accessory to crime, Montoya asserts that he may not be convicted both of being complicit in the commission of a crime and of being an accessory to that same crime, and he asserts that his conviction of accessory to crime must therefore be vacated. In doing so, Montoya not only fails to assert, as a matter of either constitutional necessity or Colorado statute, that "accessory to crime" is the same as or a lesser included offense of the crime to which he was convicted of being an accessory, or even that the two offenses are related in some other way that would statutorily bar conviction of more than one of the two for the same conduct, see Schneider v. People, 2016 CO 70, ¶¶ 11–13, 382 P.3d 835, 838-39 (explaining the General Assembly's limitations on multiple convictions in this jurisdiction and the relationship between the provisions of section 18-1-408 and constitutional protections against being twice placed in jeopardy for the same offense); rather, he expressly concedes that "accessory to crime" is not included in the greater offense, and he relies entirely on the authority of case law, none of which is from or binding on this court, largely interpreting either vastly different statutory schemes or simply relying on the common law doctrine of "parties to a crime."

■ ¶39 Although perhaps not universally so, it was largely accepted at common law that one could not be both a principal and accessory after the fact of a single crime. See generally Wayne R. LaFave, 2 Substantive Criminal Law § 13.6 (2d ed. 2003); see also id., § 13.1(a)–(c) (discussing the common law treatment of what were formerly categorized as principals in the first and second degree and accessories before and after the fact). As we have recounted elsewhere, although we had altered these common law categories by statute well before statehood, with the adoption of the Colorado Criminal Code in 1972, the General Assembly abandoned the common law notion of distinct "parties to a crime" entirely, largely in favor of the Model Penal Code approach of more expressly defining the liability of one person for the behavior of another. See Childress, ¶¶ 7–9, 363 P.3d at 156–57. In addition to eliminating any distinction among what formerly had been principals in the first and second degree and accessories before the fact, based on the Model Penal Code concept of "complicity," see §§ 18-1-601 to -603, C.R.S. (2016); Childress, ¶ 7, 363 P.3d at 156, the Colorado Criminal Code also followed the lead of the Model Penal Code in rejecting the common law notion that one who helps an offender avoid justice becomes in some sense an accomplice in the original crime. Much like the Model Penal Code, the Colorado Criminal Code therefore "rejects the theory of accessorial liability for those who aid the offender after the consummation of the crime and adopts the alternative theory of prosecution for obstruction of justice." Model Penal Code and Commentaries § 242.3, cmt. 1 (Am. Law Inst., Official Draft & Rev. Comments 1985). As distinguished from both the common law scheme and our modern complicity provision, which we have characterized as a mere theory of liability rather than a separate crime itself, see Childress, ¶¶ 7–9, 363 P.3d at 156– 57, "accessory to crime" is now a separate

crime, independent of any crime committed by a person to whom assistance is rendered, see § 18-8-105, C.R.S. (2016) (proscribing accessory to crime under title 18, article 8, part 1, which governs "Obstruction of Public Justice").

¶40 Montoya erroneously asserts that the court of appeals has held that a defendant cannot be convicted of both a charged offense and being an accessory to that offense, even under our current statutory scheme. See People v. Broom, 797 P.2d 754 (Colo. App. 1990). While the court of appeals in Broom did hold that evidence of the same act cannot serve as a predicate for conviction both as a complicitor to a crime and as an accessory, for rendering assistance in concealing that same crime, it appears that even so it may have said too much. By statute in this jurisdiction, when any conduct of a defendant establishes the commission of more than one offense, he may be prosecuted for each such offense. § 18-1-408(1). He may not, however, be convicted of more than one offense if one is included in the other, as broadly defined by the statute, or if they are related in any of the other statutorily enumerated ways barring multiple convictions. Id. The statute does not limit multiple separate convictions of any kind that a defendant may suffer as a result of their being predicated on the same conduct or evidence, much less preclude separate convictions for being complicit in the commission of a crime and rendering assistance to another committing the same crime.

¶41 However, for crimes charged by separate counts in a single prosecution, as required by section 408(2), the statute does require concurrent sentences when these crimes are based on the same act or series of acts arising from the same criminal episode and they are supported by identical evidence. § 18-1-408(3). Montoya does not assert that his six-year sentence for accessory to crime must run concurrently with his homicide-related sentences but only that his conviction for accessory to crime must be vacated. In any event, there was clearly evidence from which the jury could find that Montoya aided, abetted, advised, or encouraged his cousin to shoot, separate and distinct from evidence that Montoya rendered assistance to his cousin intending to prevent his apprehension. See People v. Muckle, 107 P.3d 380, 383–84 (Colo. 2005) (concurrent sentences required only when evidence will support no other reasonable inference than that both convictions were based on identical evidence).

## V.

¶42 Because there was sufficient evidence to support Montoya's conviction of attempted extreme indifference murder; because Montoya was barred from challenging on appeal the sufficiency of the evidence supporting his conviction for being an accessory to crime, a lesser non-included offense presented to the jury at his request; and because Montoya's simultaneous convictions of reckless manslaughter and accessory to crime neither merged nor required concurrent sentences, the judgment of the court of appeals is affirmed.

JUSTICE BOATRIGHT and JUSTICE HOOD do not participate.