Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
May 20, 2019

**2019 CO 34**

**No. 16SC442, *People v. Anderson*—Homicide—Degree of Offenses—Extreme Indifference—Sufficiency of the Evidence.**

The People petitioned for review of the court of appeals' judgment vacating Anderson's conviction for attempted extreme indifference murder.  Concluding that the universal malice element of extreme indifference murder requires for conviction that more than one person have been endangered by the defendant's conduct and also concluding that no evidence was offered to prove the defendant's shooting endangered anyone other than the victim, the court of appeals found the evidence insufficient to support the conviction.

The supreme court holds that because the statutory definition of extreme indifference murder does not limit conviction of that offense to conduct endangering more than one person, and because the evidence in this case was sufficient to permit a jury determination of the defendant's guilt of attempted extreme indifference murder, the judgment of the court of appeals vacating the defendant's conviction is reversed, and the case is remanded for consideration of any assignments of error concerning that conviction not yet addressed.

## The Supreme Court of the State of Colorado
2 East 14th Avenue • Denver, Colorado 80203

---

### 2019 CO 34

---

### Supreme Court Case No. 16SC442
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 12CA889

---

### Petitioner:

The People of the State of Colorado,

v.

### Respondent:

Richard Wesley Anderson.

---

### Judgment Reversed
*en banc*
May 20, 2019

---

**Attorneys for Petitioner:**
Philip J. Weiser, Attorney General
Elizabeth Rohrbough, Senior Assistant Attorney General
*Denver, Colorado*

**Attorneys for Respondent:**
Megan A. Ring, Public Defender
Elizabeth Porter-Merrill, Deputy Public Defender
*Denver, Colorado*

**CHIEF JUSTICE COATS** delivered the Opinion of the Court.

¶1 The People petitioned for review of the court of appeals' judgment vacating Anderson's conviction for attempted extreme indifference murder. *See People v. Anderson*, 2016 COA 47, __ P.3d __. Concluding that the universal malice element of extreme indifference murder requires for conviction that more than one person have been endangered by the defendant's conduct and also concluding that no evidence was offered to prove the defendant's shooting endangered anyone other than the victim, the court found the evidence insufficient to support the conviction.

¶2 Because the statutory definition of extreme indifference murder does not limit conviction of that offense to conduct endangering more than one person, and because the evidence in this case was sufficient to permit a jury determination of the defendant's guilt of attempted extreme indifference murder, the judgment of the court of appeals vacating the defendant's conviction is reversed, and the case is remanded for consideration of any assignments of error concerning that conviction not yet addressed.

## I.

¶3 Richard Anderson was charged with attempted deliberation murder, attempted extreme indifference murder, first degree assault against a peace officer, first degree assault causing serious bodily injury with a deadly weapon, first degree extreme indifference assault, two counts of menacing, driving while intoxicated, and two counts of committing a crime of violence. The jury found him not guilty of attempted deliberation murder, but convicted him on the remaining charges, as well as the defense-requested, lesser non-included offense of reckless endangerment. The trial court imposed a sentence of 48 years in the custody of the department of corrections for the

defendant's conviction of attempted extreme indifference murder and a total sentence of 108 years incarceration.

¶4     The prosecution presented testimonial, physical, and documentary evidence from which the jury could find the following facts. On the day in question, the defendant spent the night drinking at a bar near the intersection of Highway 86 and Highway 83 in Douglas County. At some point he appeared agitated and made statements to the effect that he was suicidal and that he had a gun and ammunition in his car.

¶5     After returning to his car in the parking lot shortly before 2 a.m., the defendant became embroiled in a dispute with the bar manager and a customer who was apparently concerned about him, alternately threatening to shoot the manager and then the customer. After being notified that the police were on the way, the defendant produced a semiautomatic handgun from under his seat and pointed it at the customer, struggled with him, and ultimately wrested his gun free of the customer's grip and drove away with it, heading north on Highway 83. While the manager was on the phone reporting the incident, the customer returned to the bar and reported that the defendant was armed and had pointed the gun at him.

¶6     A Douglas County Sheriff's deputy patrolling nearby in a marked vehicle heard a dispatch airing of the incident and description of the defendant's vehicle. Minutes later, the deputy saw a vehicle matching that description, and shortly after it turned off Highway 83, he managed to pull behind the vehicle, which then stopped on its own. The deputy stopped as well, activated his overhead lights and spotlight, and aired the vehicle's license plate over the radio.

¶7     The defendant immediately opened the driver's-side door and, despite the deputy's command to remain inside, got out and suddenly began advancing and firing on the deputy, who used the patrol car door as cover and returned fire, while retreating to the back of the patrol car.  The defendant fired at least thirteen times in rapid succession, repeatedly striking the patrol car's hood and driver's-side door; ultimately emptied his magazine; and then attempted to reload.  The deputy fired twelve rounds, wounding the defendant in the neck and abdomen, after having himself been shot by the defendant in the arm.  The shooting was over within seconds, with less than a minute having passed between the deputy's airing the defendant's license plate and his subsequent report of the shooting.

¶8     Although the surveillance video failed to show anyone else in the vicinity during the shooting, it caught a car passing the defendant on Highway 83 less than a minute before he turned off the highway and another two cars passing by him less than ten seconds before turning.  A ballistics expert testified that bullets from the defendant's firearm could have traveled the approximately 200 yards from the location of the shooting to the intersection with Highway 83, and a bullet fragment was actually recovered not far from that intersection.

¶9     The defendant did not testify at trial, but other defense witnesses, including his friends and daughters, testified that he had been depressed for the past few years, following the death of his wife; had lost his job as a result; and was eventually evicted from his home, forcing his teenage daughter to move in with his adult daughter.  An email sent from the defendant one week before the shooting indicated he intended to

4

commit suicide. Through the arguments of counsel, the defendant presented his theory of defense—that he did not intend to harm or kill the deputy but only wanted to be killed by the deputy's return fire.

¶10 Following his convictions, the defendant appealed, challenging, among other things, the sufficiency of the evidence on the count of attempted extreme indifference murder and the permissibility of his suffering multiple convictions of first degree assault for shooting the deputy. The appellate court agreed with the defendant's assertion that there was insufficient evidence that "he sought to take human life generally" because he directed his conduct at a single person and endangered only that person. The court held that as a matter of law, "universal malice," as that term is included in the statutory definition of extreme indifference murder, requires proof of conduct that creates a grave risk of death to more than one person. Because the court found there to have been no evidence that anyone other than the deputy was endangered by the defendant's shooting, it concluded there was insufficient evidence to reach the jury on the charge of attempted extreme indifference murder, and it therefore vacated that conviction. The court also vacated two of the first degree assault convictions, finding the three assault convictions to represent merely alternate ways of committing the same crime.

¶11 We issued our writ of certiorari on the question whether the court of appeals erred in concluding that the evidence could not support the jury's finding of attempted extreme indifference murder.

## II.

¶12     As we have recounted in much greater detail elsewhere, the form of homicide in this jurisdiction now referred to as extreme indifference murder has undergone considerable evolution, in both case law and legislation, in reaching its current state. *See Montoya v. People*, 2017 CO 40, ¶ 11, 394 P.3d 676, 681; *Candelaria v. People*, 148 P.3d 178, 180–83 (Colo. 2006); *People v. Jefferson*, 748 P.2d 1223, 1226–30 (Colo. 1988). After striking down a predecessor version of extreme indifference murder as being indistinguishable from, but nevertheless punished more severely than, the knowing homicide offense of second degree murder, *see People v. Marcy*, 628 P.2d 69, 71–72 (Colo. 1981), this court upheld the amended statute defining extreme indifference murder against a similar equal protection challenge, *Jefferson*, 748 P.2d at 1233. We did so largely as the result of our understanding of the current statute as, unlike its predecessor, defining a crime of greater social consequence than second degree murder by proscribing certain killing acts of a particularly heinous nature, rather than by attempting to carve out a new and intermediate culpable mental state between knowledge and intent. *Id*. at 1232; *see also Montoya*, ¶ 11, 394 P.3d at 682; *Candelaria*, 148 P.3d at 181.[1]

¶13     In *Candelaria*, we explained our reasoning in *Jefferson* in greater detail, focusing on the nature of the killing acts, or *actus rei*, falling within the statutory definition of extreme

---

[1] The current statute specifies that a person commits first degree murder if: "under circumstances *evidencing an attitude of universal malice* manifesting extreme indifference to the value of human life *generally,* he knowingly engages in conduct which creates a grave risk of death to a person, *or persons,* other than himself, and thereby causes the death of another." § 18-3-102(1)(d), C.R.S. (2018) (emphases added to reflect amendments).

6

indifference murder, and ultimately distinguishing them from other acts causing death, as ones "objectively demonstrating a willingness to take life indiscriminately." *Candelaria*, 148 P.3d at 182. We there reasoned that while a killing act putting at grave risk a number of individuals not specifically targeted by the defendant, like secreting a bomb on an airplane to kill a particular individual, could be an act demonstrating such a willingness to take life indiscriminately, so too would a killing act putting at risk no more than a single victim, but doing so without knowing or caring who that victim might be. *Id.* Relying heavily on the legislature's decision to add the words, "or persons," rather than substituting them for the existing word, "person," we expressly held that the amended statute necessarily contemplates killing acts of both types. *Id.* at 182–83.

¶14    The court of appeals therefore erred in holding that the offense of extreme indifference murder in this jurisdiction can be committed only by conduct that actually endangers more than one person. Whatever the intermediate appellate court may have considered to be the implications of the secondary authority we referenced as partial support for our ultimate conclusion in *Candelaria*, *see id.* at 183 (citing *State v. Anderson*, 616 P.2d 612, 615 (Wash. 1980), and *State v. Pettus*, 951 P.2d 284, 288 (Wash. Ct. App. 1998)), there can be no question that we expressly construed the statute as comprehending "acts putting at risk a single victim, without knowing or caring who that may be," as well as those acts "put[ting] at grave risk a number of individuals not targeted by the defendant," *id.* at 182–83. Perhaps more fundamentally, however, our holding rested on our interpretation of the statute as singling out for special treatment those acts causing the death of another under circumstances evidencing a *willingness* to

7

take life indiscriminately—not acts having an *actual effect* of endangering a number of lives, or even one life, indiscriminately. While knowingly causing the death of a particular person by means endangering others may very well evidence a willingness on the actor's part to take life indiscriminately, the number of other people endangered by the conduct in question is clearly not dispositive of the actor's subjective willingness to take life indiscriminately, much less of the classification of the killing act itself as one evidencing a willingness to take life indiscriminately.

¶15    Although in *Candelaria* we made clear that the conduct proscribed by the statute could include either acts putting at risk a single person or acts putting at risk more than one person, in doing so we did not purport to define or in any way circumscribe the universe of conduct evidencing a willingness to take life indiscriminately. Quite the contrary, while the statute separately requires conduct causing the death of another, the feature of extreme indifference murder distinguishing it from, and elevating it in culpability above, second degree murder is the requirement that the killing conduct be engaged in under circumstances evidencing an attitude of universal malice manifesting extreme indifference to the value of human life generally, *see* § 18-3-102(1)(d), C.R.S. (2018); *Jefferson*, 748 P.2d at 1231–32, which we have construed to describe a killing act objectively demonstrating a willingness to take life indiscriminately, *Candelaria*, 148 P.3d at 182. Whether the conduct in question actually endangers more than a single targeted person, or even whether the actor subjectively intends to or is aware that his conduct may ultimately take life indiscriminately, the question for the trier of fact is whether the act by

8

which death is knowingly caused, by its very nature or the surrounding circumstances of its commission, objectively evidences such a willingness.

### III.

¶16 For more than four decades we have held there to be sufficient evidence to support a conviction if "the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *People v. Bennett*, 515 P.2d 466, 469 (Colo. 1973); *see also Jackson v. Virginia*, 443 U.S. 307, 313–20 (1979) (recounting history of similar federal standard); *Clark v. People*, 232 P.3d 1287, 1292 (Colo. 2010) (rejecting requirement that under substantial evidence standard the prosecution must "exclude every reasonable hypotheses other than that of guilt" or disprove the defendant's theory (quoting *Bennett*, 515 P.2d at 469)). Had the deputy in this case actually been killed rather than merely wounded, and had the defendant been charged with extreme indifference murder for causing his death, the relevant inquiry for purposes of the sufficiency of the evidence to prove an *actus reus* satisfying the requirements of extreme indifference murder would therefore have been whether the defendant's conduct causing death—rapidly firing thirteen rounds in the deputy's direction, in that particular location and at that particular time of night—could be found by reasonable jurors to be conduct evidencing a willingness to take life indiscriminately, without knowing or caring whose life, or whose lives, might be lost as the result of his conduct.

¶17    In this case, because the deputy, despite having been shot in the flurry of gunfire aimed in his direction, did not die, the defendant was instead charged with and convicted of *attempted* extreme indifference murder. With regard to the crime of attempted extreme indifference murder in particular, we recently reaffirmed in *Montoya* the now well-settled proposition that attempt liability in this jurisdiction does not require a specific intent, or conscious objective to accomplish a proscribed result, ¶ 17, 394 P.3d at 683, and instead can attach to crimes requiring merely knowledge with regard to the conduct, circumstances, or result defining the crime in question, *see People v. Krovarz*, 697 P.2d 378, 383 (Colo. 1985), or even to crimes of recklessness, *see People v. Thomas*, 729 P.2d 972, 976–77 (Colo. 1986).

¶18    For conviction of attempted extreme indifference murder, as attempt liability has been held to exist in this jurisdiction, there must be evidence from which a trier of fact can find that the actor was aware he was engaging in conduct strongly corroborative of the firmness of his purpose to complete the commission of the crime of extreme indifference murder, *see* § 18-2-101(1), C.R.S. (2018) (defining criminal attempt); *see also People v. Lehnert*, 163 P.3d 1111, 1113 (Colo. 2007), and commission of the crime of extreme indifference murder itself could be complete only if the defendant caused the death of another by knowingly engaging in conduct creating a grave risk of death to a person or persons other than himself, under circumstances evidencing an attitude of universal malice manifesting extreme indifference to the value of human life generally, *see Montoya*, ¶ 17, 394 P.3d at 683–84.

¶19 Notwithstanding the theory advanced by the defense that rather than attempting to kill the deputy, the defendant was hoping *to himself be killed by* the deputy, there was an abundance of evidence strongly corroborative of his purpose to knowingly kill. The court of appeals did not suggest otherwise but merely found that there was insufficient evidence from which the jury could have reasonably found that the conduct by which the defendant nearly succeeded in doing so was such as to demonstrate a willingness to take life indiscriminately, as required to elevate second degree murder to extreme indifference murder. When the statute defining extreme indifference murder is properly understood as proscribing killing acts demonstrating, in and of themselves, a willingness to take life indiscriminately, regardless of the number of lives actually endangered, there was, however, also sufficient evidence to elevate the crime committed by the defendant from attempted second degree murder to the crime of attempted extreme indifference murder.

¶20 When all of the relevant evidence, both direct and circumstantial, is viewed as a whole and in the light most favorable to the prosecution, there was clearly sufficient evidence at trial from which reasonable jurors could find not only that the defendant came close to killing the deputy, but also that the defendant's conduct in doing so, under the circumstances of its commission, demonstrated a willingness to take life indiscriminately, either because it objectively evidenced a willingness to kill as many as thirteen bystanders within range of the defendant's indiscriminate shooting, or simply because it evidenced a willingness to kill whoever was pursuing him, in order to draw return fire and be killed himself. With regard to other bystanders, there was evidence from which the jury could find that the defendant's gunfire was not only capable of

11

reaching, but in fact practically reached, as far as Highway 83, the highway from which the defendant had recently turned and upon which he had only minutes before necessarily observed other travelers. With regard to his pursuers, however many and whoever they might have been, if his own theory were credited, the defendant did not shoot with the purpose of preventing them from capturing him at all, but rather with the purpose of drawing return fire. Yet, rather than firing into the air or at least over the heads of any pursuers, the defendant fired directly at the police vehicle pursuing him, actually striking the driver's door a number of times and actually wounding the deputy behind it. Virtually by his own admission, the defendant's multiple firings evidenced both an objective and subjective willingness to kill however many officers might be chasing him, in the hope that one of them would return fire and kill him.

¶21   With regard to lesser included offenses of homicide, we have long expressed a preference for permitting juries to determine the precise statutory grade of criminal homicide for which the defendant should be punished. *See People v. Shaw*, 646 P.2d 375, 379 (Colo. 1982); *Crawford v. People*, 20 P. 769, 770 (Colo. 1889). Similarly, where there is clearly sufficient evidence to support a finding that the defendant committed a knowing homicide satisfying the statutory elements of second degree murder, the question whether the nature and circumstances of its commission were such as to necessarily demonstrate a willingness of the actor to take life indiscriminately is peculiarly a matter for the jury. We have previously indicated, and now reaffirm, that the *actus rei* capable of supporting a conviction for extreme indifference murder are not limited by the statute to those actually endangering more lives than merely that of the victim. In the absence

12

of such a definitional prerequisite, the evidence in this case was sufficient to support a jury determination that the defendant's conduct satisfied the statutory definition of the kind of act causing death.

## IV.

¶22 Because the statutory definition of extreme indifference murder does not limit conviction of that offense to conduct endangering more than one person, and because the evidence in this case was sufficient to permit a jury determination of the defendant's guilt of attempted extreme indifference murder, the judgment of the court of appeals vacating the defendant's conviction is reversed, and the case is remanded for consideration of any assignments of error concerning that conviction not yet addressed.