22CA1311 Peo v Madison 07-10-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1311
City and County of Denver District Court No. 21CR4630
Honorable Martin F. Egelhoff, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Anthony G. Madison,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE LIPINSKY
Pawar and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 10, 2025

Philip J. Weiser, Attorney General, Caitlin E. Grant, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Daniel Kent, Alternate Defense Counsel, Denver, Colorado, for Defendant-
Appellant

¶ 1    Anthony G. Madison appeals his convictions on three counts of attempted extreme indifference murder.  We affirm.

## I.    Background

¶ 2    A jury could have reasonably found the following facts from the evidence introduced at trial.

¶ 3    Madison and Kailea Leaverton lived in the same apartment building.  Madison told Leaverton that he "wanted to have sex" with her, but she rebuffed him.  Madison responded by saying that "he didn't want to be [her] friend" and took action against her.  He wrote expletives and derogatory language on Leaverton's apartment door, sent her a demeaning letter, and wrote insulting words and profanity on the parking lot directly below Leaverton's bedroom window.

¶ 4    Leaverton told Brandon Hardin, her boyfriend, about the messages and asked Hardin to "talk to" Madison because "there was nothing [she] could do or to say to [him] for him to leave [her] alone."

¶ 5    On July 28, 2021, Leaverton, Hardin, and Joshua Moore, a mutual friend, ran errands in Moore's truck.  After the three completed their errands, Hardin and Moore dropped off Leaverton

1

in the alley behind her apartment building.  When Madison "came around [a] corner," Hardin said, "[T]his is our opportunity to go talk to him," about the messages he left for Leaverton.

¶ 6     Hardin got out of the truck, approached Madison, and "told [him] to leave [Leaverton] alone."  During the interaction, Hardin "was not aggressive or rude."  Leaverton told Madison that she did not like his messages and "wanted to be married" to Hardin.  Neither Leaverton nor Moore nor Hardin was armed at the time.

¶ 7     Madison replied, "Okay, [Leaverton].  I'll leave you alone."  Leaverton, Hardin, and Moore then "turn[ed] to walk away."  Madison "walked a couple of feet . . . back the way he came" but then spoke Leaverton's name.  When Leaverton turned around, she saw that Madison was aiming a gun at her.  He fired once.  The shot missed.  Madison then pointed the gun at Moore and said, "You're not so tough now, are you, motherfucker?"

¶ 8     Leaverton testified that Hardin thought Madison had shot her and told Madison, "You shot my wife."  Based on this misunderstanding, Hardin "got a gun" from the truck to defend Leaverton.  Madison and Hardin "got into a shootout."  No one was shot, however.  Surveillance video captured the incident.

¶ 9 Madison was arrested and charged with three counts of criminal attempt to commit murder in the first degree (after deliberation) for his actions against Hardin, Leaverton, and Moore (the victims); three counts of criminal attempt to commit murder in the first degree (extreme indifference) for his actions against the victims; one count of possession of a weapon by a previous offender (POWPO); and six counts of crime of violence with the use of a deadly weapon that corresponded to the six attempted murder counts.

¶ 10 The prosecution filed, and the court granted, a pretrial motion to dismiss the three attempted murder in the first degree (after deliberation) counts and the three corresponding crime of violence counts.

¶ 11 Among other witnesses, Leaverton and Madison testified at trial. (Hardin died before trial.) Defense counsel conceded that Madison was guilty of POWPO but argued to the jury that Madison was not guilty of attempted extreme indifference murder because he had acted in self-defense.

¶ 12 The jury convicted Madison of the three attempted extreme indifference murder counts, the three corresponding crime of

violence with the use of a deadly weapon counts, and the POWPO count.

¶ 13    On appeal, Madison contends that the court inadequately instructed the jury on self-defense and attempted extreme indifference murder and abused its discretion in formulating answers to two jury questions.  Additionally, Madison asserts that the prosecutor committed misconduct during closing argument.  Lastly, Madison argues cumulative error.

## II.    Analysis

### A.    The Court's Self-Defense Jury Instruction

¶ 14    Madison asserts that the court's self-defense instruction was contrary to *People v. Jones*, 675 P.2d 9 (Colo. 1984), and *Riley v. People*, 266 P.3d 1089 (Colo. 2011), for two reasons: First, it did not expressly tell the jury to consider the totality of the circumstances and, second, did not instruct the jury to consider the number of persons who reasonably appeared to present a threat to Madison when determining the reasonableness of Madison's fear of imminent bodily harm or death and his use of the gun.  We disagree.

¶ 15    (Madison also asserts that the court's self-defense instruction deprived him of his constitutional rights "to put on a complete

4

defense and be convicted beyond a reasonable doubt." We are not convinced, however, that the court's self-defense instruction lowered the prosecution's burden of proof or directly implicated any of Madison's specific constitutional rights. *See People v. Flockhart,* 2013 CO 42, ¶ 20, 304 P.3d 227, 233 ("Only those errors 'that specifically and directly offend a defendant's constitutional rights are "constitutional" in nature.'" (quoting *Wend v. People*, 235 P.3d 1089, 1097 (Colo. 2010))).)

### 1. Standard of Review

¶ 16    A trial court "has substantial discretion in formulating the jury instructions, so long as they are correct statements of the law and fairly and adequately cover the issues presented." *People v. Gallegos*, 226 P.3d 1112, 1115 (Colo. App. 2009). Similarly, we review a court's "decision regarding supplemental instructions for an abuse of discretion." *People v. Dinapoli*, 2015 COA 9, ¶ 9, 369 P.3d 680, 682.

¶ 17    We will not reverse a conviction "if the [jury] instructions, read as a whole, adequately inform the jury of the law." *Gallegos*, 226 P.3d at 1115. But "[w]e review de novo whether a particular jury

instruction correctly states the law." *People v. Nerud*, 2015 COA 27, ¶ 35, 360 P.3d 201, 207.

## 2. Additional Facts

¶ 18 Madison tendered the following "multiple assailants" jury instruction, which his counsel said was premised on *Riley*:

> The totality of the circumstances, including the number of persons reasonably appearing to be threatening the defendant, must be considered by the jury in evaluating the reasonableness of the defendant's belief in the necessity of defensive action, and the reasonableness of the force used by him to defen[d] against the apparent danger.

Defense counsel argued that the "multiple assailants" language could appear either in a standalone instruction or "a paragraph folded into" the court's self-defense instruction.

¶ 19 The prosecutor responded that, under the self-defense case law, a "multiple assailants" instruction was unnecessary so long as the court instructed the jury to "consider similar conditions and circumstances and the totality of the circumstances." The prosecutor added that the court's self-defense instruction could say that "the jury must consider the totality of the circumstances, and [the court] could go further to say including the number of people

present." But the prosecutor said that "the case law cited in *Riley*" did not require such language.

¶ 20 Defense counsel asked the court to tell the jury in the self-defense instruction that it "must consider [the totality of the circumstances] in evaluating the reasonableness of the defendant's belief and the necessity of defensive action and the reasonableness of the force used by him to defend against the apparent danger" but noted that he was "fine with amending [the language] or abbreviating it" as the prosecutor suggested.

¶ 21 Noting that the underpinning of "self-defense is reasonableness, and actions need to be reasonable," the court agreed with defense counsel that, "in determining what is reasonable," the jury should "look at all the circumstances." However, it said it did not need to include "a specific instruction defining all the circumstances that go into that reasonableness analysis." The court explained that "the philosophy of jury instructions in terms of the pattern instructions [is] to avoid" jury instructions based upon "just case law." Therefore, it ruled that it would not provide the jury with the defense's "multiple assailants" instruction.

¶ 22 Defense counsel persisted and again asked for a "multiple assailants" instruction. He said that, "at a minimum," the court should change "other persons" to "other person or persons" in the self-defense instruction because the incident "clearly [involved] more than one person."

¶ 23 The court agreed:

> THE COURT: So if in the second paragraph we say a person is justified in using physical force against another person or persons without retreating, that's what you're asking for?
>
> [DEFENSE COUNSEL]: And then repeating the "or persons" at the next juncture where the comment is.
>
> THE COURT: So without retreating in order to defend himself against what he considers the use or imminent use of unlawful physical force by that other person or persons, yes?
>
> [DEFENSE COUNSEL]: Yes, Your Honor.
>
> THE COURT: I can do that.

¶ 24 The court provided the jury with the following self-defense instruction:

> A person is justified in using physical force upon another person or persons without first retreating in order to defend himself from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person or persons, and he may use

8

a degree of force which he reasonably believes to be necessary for that purpose.

However, a person is not justified in using physical force if he is the initial aggressor; except that his use of physical force upon another person under the circumstances is justifiable if he withdraws from the encounter and effectively communicates to the other person his intent to do so, but the other person nevertheless continues or threatens the use of unlawful physical force.

The court's initial aggressor language follows the Colorado Model Criminal Jury Instructions. *See* COLJI-Crim. H:13 (2022).

### 3. The Court Did Not Err in Formulating the Initial Aggressor Language in the Self-Defense Instruction

¶ 25 Madison contends that the self-defense instruction was erroneous because it did not direct the jury to consider the totality of the circumstances and the number of persons who reasonably appeared to be threatening Madison. We disagree.

¶ 26 While the model instructions are not "a safe harbor that insulates instructional error from reversal," they "have been approved in principle by [the supreme] court and serve as beacon lights to guide trial courts." *Galvan v. People*, 2020 CO 82, ¶ 38, 476 P.3d 746, 756-57 (quoting *Garcia v. People*, 2019 CO 64, ¶ 22,

9

445 P.3d 1065, 1069).  Further, "it is unnecessary to give an instruction that is encompassed in other instructions given by the court."  *People v. Garcia*, 1 P.3d 214, 222 (Colo. App. 1999), *aff'd*, 28 P.3d 340 (Colo. 2001); *see Beckett v. People*, 800 P.2d 74-75, 78 (Colo. 1990) (concluding that the defendant was not entitled to an "apparent necessity" jury instruction because the trial court's self-defense instruction tracked the statute and adequately apprised the jury that it must consider "the totality of circumstances . . . in evaluating the reasonableness of the accused's belief in the necessity of defensive action" (quoting *Jones*, 675 P.2d at 14)); *Hare v. People*, 800 P.2d 1317, 1319 (Colo. 1990) (holding that the court's self-defense instruction encompassed the defense's tendered instruction).

### a.  *Jones* and *Riley*

Madison contends that, "[w]hile [the model] instructions are normally adequate, a supplemental or modified instruction [was] necessary to adequately instruct the jury to comply with *Jones* and *Riley*."  He argues that *Jones* and *Riley* require the court to instruct the jury that it must consider the "totality of circumstances, including the number of persons reasonably appearing to be

threatening the accused," in self-defense cases involving multiple assailants. *Jones*, 675 P.2d at 14. We disagree with Madison's reading of the case law.

¶ 28 The defendant in *Jones* testified that the victim and his associates were "about to attack him and . . . only after [the victim] struck the first blow and the [victim's associates] entered the encounter did [the defendant] use his blackjack in self-defense." *Id.* The supreme court held that, given these facts, the district court erred because its self-defense jury instruction "omitted any reference to the defendant's right to use force" to defend himself against the victim's associates. *Id.* at 13.

¶ 29 In *Riley*, the supreme court clarified its holding in *Jones*. The defendant in *Riley* had used a knife, arguably in self-defense, after two people physically attacked him. 266 P.3d at 1091. The *Riley* court explained that *Jones* does not require that the court give a specific "multiple assailants" instruction "in *every* case involving both multiple assailants and self-defense." *Id.* at 1094. Self-defense instructions will satisfy *Jones* so long as they "properly direct the jury to consider the totality of the circumstances during its deliberations on reasonableness." *Id.* Because the jury

11

instructions in *Riley* were "broad enough to encompass [the defendant]'s multiple assailants theory of defense," the supreme court concluded that the district court's refusal to provide the defense's tendered "multiple assailants" instruction did not run afoul of *Jones*. *Id.* at 1095.

¶ 30    In addition, in *People v. Roberts-Bicking*, the defendant claimed that the victims, who had previously threatened to physically harm him, entered his "bedroom area" and moved towards him. 2021 COA 12, ¶¶ 4-9, 490 P.3d 1128, 1131-32. The defendant shot one of them and punched the other. *Id.* Although the district court rejected the defense's tendered "multiple assailants" instruction, it told the jury, in response to a jury question, that it must consider the "totality of the circumstances" when making its reasonableness determination. *Id.* at ¶¶ 13-16, 490 P.3d at 1132-33.

¶ 31    The division in *Roberts-Bicking* held that, "while the initial [model] instructions may have been inadequate," in telling the jury to consider the totality of the circumstances, "the supplemental instruction provided in response to the jury's question cured any deficiency." *Id.* at ¶¶ 26-27, 490 P.3d at 1134-35. The division premised its holding on the *Riley* court's conclusion that "[a]ll that

12

is required [of jury instructions] is that the jury be instructed to consider the reasonableness of the defendant's beliefs and actions under the totality of the circumstances." *Roberts-Bicking*, ¶ 28, 490 P.3d at 1135 (citing *Riley*, 266 P.3d at 1094).

### b.    The Initial Aggressor Instruction

¶ 32    Although the court's initial aggressor instruction did not refer to "person or persons," we conclude that it sufficiently addressed Madison's self-defense theory for three reasons. *See Riley*, 266 P.3d at 1095.

¶ 33    First, it tracked the model jury instructions in effect at the time of trial. *See* COLJI-Crim. H:13 (2022); *Galvan*, ¶ 38, 476 P.3d at 756-57.

¶ 34    Second, the court's self-defense instruction did not limit the jury's consideration to one person's conduct, even though the instruction's initial aggressor language only referred to a "person." Indeed, in the self-defense instruction, the court told the jury it had to find what Madison "reasonably believe[d]" when he evaluated the threat posed by other "person or persons" and the appropriateness of his degree of force.

¶ 35     Moreover, the court's first instruction said the jury must "consider all the evidence in light of" life experiences, "[n]o single instruction describes all the law," and it must consider the court's instructions "together as a whole." *See Gallegos*, 226 P.3d at 1115. The attempted extreme indifference murder instruction and the deadly weapon instruction also directed the jury to reach its conclusions only "[a]fter considering the evidence."

¶ 36     Third, the evidence and the lawyers' arguments made it unlikely that a reasonable juror could have thought it was barred from considering a situation involving multiple attackers when evaluating the reasonableness of Madison's belief that he was threatened with the imminent use of unlawful physical force. *See Boyde v. California*, 494 U.S. 370, 383 (1990) ("[W]e think it unlikely that reasonable jurors would believe the court's instructions transformed all of this 'favorable testimony into a virtual charade.'" (quoting *California v. Brown*, 479 U.S. 538, 542 (1987))). For example, defense counsel repeatedly told the jury that Madison acted in response to the threat from the victims. In addition, the prosecutor reminded the jury to consider "the totality

of the circumstances, not just one fact here, one fact there," but "[e]verything that [Madison] perceived at the time."

¶ 37    Accordingly, the court did not err when it instructed the jury on self-defense.

### B.    The Court's Attempted Extreme Indifference Murder Instruction

¶ 38    Madison contends that the attempted extreme indifference murder instruction "was erroneous because it did not specify the jury could only convict Madison of extreme indifference murder for a particular named victim if it found he had attempted to take the life of that named victim (even if he did not intend to take the life of that victim)." We disagree.

### 1.    Preservation and Standard of Review

¶ 39    The parties agree that Madison did not preserve his challenge to the attempted extreme indifference murder instruction. Therefore, we review for plain error. *See People v. Hamilton*, 2019 COA 101, ¶ 14, 452 P.3d 184, 191.

¶ 40    "Under Crim. P. 52(b), plain error occurs when there is (1) an error, (2) that is obvious, and (3) that so undermines the fundamental fairness of the trial itself as to cast serious doubt on

15

the reliability of the judgment of conviction." *Cardman v. People*, 2019 CO 73, ¶ 19, 445 P.3d 1071, 1079.

## 2.    Additional Facts

¶ 41     At the jury instruction conference, the court explained that it combined the instructions for attempt and extreme indifference murder because "[s]ometimes it's confusing when the jury has separate instructions as to the attempt and separate instructions as to the murder in the [first degree]." Madison's counsel did not object to the combined instruction.

¶ 42     The court provided the jury with the following instruction on attempted extreme indifference murder:

> The elements of the crime of Criminal Attempt to Commit Murder in the First Degree (extreme indifference) are:
>
> 1.    That the defendant,
>
> 2.    in the State of Colorado, at or about July 28, 2021,
>
> 3.    knowingly,
>
> 4.    engaged in conduct constituting a substantial step toward the commission of Murder in the First Degree (extreme indifference).
>
> A "substantial step" is any conduct, whether act, omission, or possession, which is strongly

16

corroborative of the firmness of the actor's purpose to complete the commission of the offense.

The elements of the crime of Murder in the First Degree (extreme indifference) are:

1. That the defendant,

2. in the State of Colorado, at or about July 28, 2021,

3. knowingly,

4. under circumstances evidencing an attitude of universal malice manifesting extreme indifference to the value of human life generally,

5. engaged in conduct which created a grave risk of death to a person, or persons, other than himself, and

6. thereby caused the death of another.

After considering the evidence, if you decide the prosecution has proven each of the elements beyond a reasonable doubt, you should find the defendant guilty of Criminal Attempt to Commit Murder in the First Degree (extreme indifference).

After considering the evidence, if you decide the prosecution has failed to prove any one or more of the elements beyond a reasonable doubt, you should find the defendant not guilty of Criminal Attempt to Commit Murder in the First Degree (extreme indifference).

*See* COLJI-Crim. G2:01 (2022); COLJI-Crim. 3-1:04 (2022).

17

¶ 43 In addition, the court gave the jury an instruction defining "[u]niversal malice" as "conduct that, by its very nature and the circumstances of its commission, evidences a willingness to take human life indiscriminately, without knowing or caring who the victim may be or without having an understandable motive or provocation." That instruction tracked the model instruction. *See* COLJI-Crim. 3-1:04 cmt. 6 (2022).

### 3. The Court Did Not Err in Formulating the Attempted Extreme Indifference Murder Instruction

¶ 44 A person commits first degree murder (extreme indifference) if, "[u]nder circumstances evidencing an attitude of universal malice manifesting extreme indifference to the value of human life generally, he knowingly engages in conduct which creates a grave risk of death to a person, or persons, other than himself, and thereby causes the death of another." § 18-3-102(1)(d), C.R.S. 2024.

¶ 45 Extreme indifference murder is different from other forms of homicide in that the actor must have demonstrated "a willingness to take human life indiscriminately, without knowing or caring who the victim may be or without having an understandable motive or

18

provocation." *Candelaria v. People*, 148 P.3d 178, 181-82 (Colo. 2006). To knowingly put "a person, or persons," § 18-3-102(1)(d), at grave risk of death "necessarily comprehends killing acts that put at grave risk a number of individuals not targeted by the defendant, as well as acts putting at risk a single victim," *Candelaria*, 148 P.3d at 182-83.

¶ 46 The *Candelaria* court squarely addressed the applicability of extreme indifference murder when the defendant's conduct put numerous people at risk:

> Although secreting an explosive device in an airplane to kill one of the passengers is certainly a murderous act directed at a particular, intended victim, it is not directed *solely* at the intended victim. Because it is an act gravely endangering the other passengers as well, it constitutes conduct evidencing an extreme indifference to the value of human life generally.

*Id.* at 182.

¶ 47 Madison contends that the court's extreme indifference instruction was erroneous because it did not "track the [c]omplaint and information, which specified the victim for each count of attempted extreme indifference murder." He argues that a proper attempted extreme indifference murder instruction must say that,

19

to convict the defendant, the jury must find, along with the other elements, that the defendant "engaged in conduct which created a grave risk of death to a person, or persons, other than himself, and *thereby attempted to cause the death of [named victim]*." (Emphasis added.) We disagree.

¶ 48 The court's extreme indifference instruction tracks the criminal attempt, § 18-2-101(1), C.R.S. 2024, and first degree murder, § 18-3-102(1)(d), statutes. *See Galvan*, ¶ 37, 476 P.3d at 756 ("A jury instruction that tracks the exact language of a statute is unlikely to mislead the jury on the state of the law." (quoting *People in Interest of J.G.*, 2016 CO 39, ¶ 42, 370 P.3d 1151, 1163)). Further, the title of each attempted extreme indifference murder verdict form specified a different victim.

¶ 49 Madison also contends that the attempted extreme indifference murder instruction, "taken to its logical conclusion," would mean that "the prosecution could name infinite victims in the [c]omplaint and [i]nformation — even those unrelated to the case — and secure a conviction against a defendant for the attempted murder of all of those victims so long as the jury found a defendant attempted to kill 'another.'" We disagree.

20

¶ 50    The supreme court held in *Montoya v. People* that conscious but indiscriminate "shooting into a crowd of people presents a quintessential example of circumstances evidencing a willingness to take life indiscriminately and therefore, in the language of the statute, evidencing universal malice manifesting extreme indifference to the value of human life generally." 2017 CO 40, ¶ 21, 394 P.3d 676, 684; *see People v. Anderson*, 2019 CO 34, ¶ 14, 442 P.3d 76, 79 (explaining that the first degree murder (extreme indifference) statute singles "out for special treatment those acts causing the death of another under circumstances evidencing a *willingness* to take life indiscriminately — not acts having an *actual effect* of endangering a number of lives, or even one life, indiscriminately"). Further, jury instruction twelve told the jury it could find Madison "guilty or not guilty of any one or all of the offenses charged."

¶ 51    Thus, the court did not err, much less plainly err, in drafting the attempted extreme indifference murder jury instruction.

## C. The Court Did Not Abuse Its Discretion by Providing Its Supplemental Instruction in Response to Jury Questions Numbers One and Two

¶ 52    Madison contends that the court abused its discretion by answering no to jury question number one: "Because these attempted murder charges are *specific* to three individuals . . . [d]oes the defendant *have* to be attempting murder of one or more of the *specific people* in order for a substantial step towards Murder in the first degree (*extreme indifference*) to be true?" He also contends that the court erroneously referred the jury back to instruction twelve in response to jury question number two, "Are we allowed to find [Madison] guilty of three, two or only one of the three counts of attempted murder (extreme indifference)?"

¶ 53    When a jury asks a question, an additional instruction is "often appropriate" unless

> (1) the jurors can be adequately informed by directing their attention to some portion of the original instructions;
>
> (2) the request concerns matters not in evidence or does not pertain to the law of the case; or
>
> (3) the request would call upon the judge to express an opinion upon factual matters that the jury should determine.

*People v. Frye*, 2014 COA 141, ¶ 26, 356 P.3d 1000, 1005 (quoting

*Copeland v. People*, 2 P.3d 1283, 1288 (Colo. 2000)).

### 1. Jury Question Number One

#### a. Standard of Review

¶ 54     We review the court's response to jury question number one

for an abuse of discretion. *See People v. Black*, 2020 COA 136,

¶ 13, 490 P.3d 891, 895. "A trial court does not abuse its

discretion unless its decision was manifestly arbitrary,

unreasonable, or unfair or was based on an erroneous

understanding of the law." *People v. Perez*, 2024 COA 94, ¶ 34, 559

P.3d 652, 660. "In assessing whether a trial court's decision is

manifestly unreasonable, arbitrary, or unfair, we ask not whether

we would have reached a different result but, rather, whether the

trial court's decision fell within the range of reasonable options."

*People v. Archer*, 2022 COA 71, ¶ 23, 518 P.3d 1143, 1149-50

(quoting *Hall v. Moreno*, 2012 CO 14, ¶ 54, 270 P.3d 961, 973).

#### b. Additional Facts

¶ 55     The court told the attorneys that its initial inclination was to

respond no to question number one. The prosecutor agreed, but

defense counsel asserted that "the answer should be yes."

¶ 56    The court said that *Anderson* supported its "first response" of answering no because the case held that "there can be named victims that are in danger based upon the conduct, but there doesn't need to be any specific targeting of or any specific intent to harm any individuals." Further, the court said that *Anderson* highlighted "the difference between after deliberation or some other theory of murder in the [first degree] as opposed to extreme indifference." The court also said that *People v. Reynolds*, 252 P.3d 1128 (Colo. App. 2010), and *Candelaria* supported a no response.

¶ 57    Defense counsel argued that *Anderson* was distinguishable because shooting a gun five times was "nothing like secreting a bomb on an airplane" — an example of "evidence objectively demonstrating a willingness to take life indiscriminately" noted in that case. *See Anderson*, ¶ 13, 442 P.3d at 78-79. For this reason, defense counsel asked the court to "either answer yes [to jury question one] or not send an answer back [to the jury] and tell the jury that they have the instructions that they need."

¶ 58    The court disagreed and decided to answer no to jury question number one:

I think if a jury is led to believe there needs to be a specific target involved that essentially changes the theory, changes the charge to either a specific intent-like charge or even a knowing charge as to the specific individual as opposed to for lack of a better description a spree charged like this where there's multiple rounds being fired, allegedly indiscriminately, endangering multiple people, and there's named people present. And the same thing as a bomb and naming the people on the plane as the victims.

### c. The Court Did Not Abuse Its Discretion by Answering No to Jury Question Number One

¶ 59 Madison asserts that the court's answer to jury question number one "was a clear misstatement of an essential element of the crime; the jury did have to find Madison attempted to kill the named victim in order to convict him." We disagree.

¶ 60 Unlike intentional first degree murder after deliberation, "the crime of extreme indifference first degree murder does not require proof that the defendant intended to cause the death of another." *Reynolds*, 252 P.3d at 1133. Instead, "it requires proof that the defendant knowingly engaged in conduct that created a grave risk of death to one or more persons and demonstrated extreme indifference to the value of human life generally." *Id.*

¶ 61 To convict a defendant of attempted extreme indifference murder, "there must be evidence from which a trier of fact can find that the actor was aware he was engaging in conduct strongly corroborative of the firmness of his purpose to complete the commission of the crime of extreme indifference murder." *Montoya,* ¶ 17, 394 P.3d at 683. The commission of the crime would be complete "only if the defendant caused the death of another by knowingly engaging in conduct creating a grave risk of death to a person or persons other than himself . . . under circumstances evidencing an attitude of universal malice manifesting extreme indifference to the value of human life generally." *Id.* at ¶ 17, 394 P.3d at 683-84.

¶ 62 The *Anderson* court concluded that reasonable jurors could find that the defendant's "flurry of gunfire aimed in [the officer's] direction," *Anderson,* ¶ 17, 442 P.3d at 80, demonstrated a willingness to take life indiscriminately, "either because it objectively evidenced a willingness to kill as many as thirteen bystanders within range of the defendant's indiscriminate shooting, or simply because it evidenced a willingness to kill whoever was pursuing him, in order to draw return fire and be killed himself," *id.*

at ¶ 20, 442 P.3d at 80.  The court noted the evidence from which the jury "could find that the defendant's gunfire was not only capable of reaching" other bystanders but that it "practically reached" a "highway . . . upon which he had only minutes before necessarily observed other travelers."  *Id.*

¶ 63    Accordingly, the jury was not required to find that Madison attempted to kill each victim before it could convict him of the three counts of attempted extreme indifference murder.  *See id.* at ¶ 20, 442 P.3d at 80-81; *Candelaria*, 148 P.3d at 183 (holding that "the evidence was sufficient to permit a finding that [the defendant and his associates] were aware their shooting was practically certain to cause death and was carried out under circumstances evidencing a willingness to take the lives of others without knowing or caring who they were").

¶ 64    Thus, we conclude that the court acted within its discretion when it answered "no" to jury question number one.  *See Black*, ¶ 13, 490 P.3d at 895; *see also Frye*, ¶ 22, 356 P.3d at 1005.

### 2. Jury Question Number Two

#### a. Additional Facts

¶ 65 The prosecutor asserted that the court should answer yes to jury question number two. Defense counsel argued that the answer to the question was "adequately described in the instruction packet that was already provided by the [c]ourt to the jury" and that the court "could just indicate to the jury that they have all the instructions they need."

¶ 66 The court agreed with defense counsel and said it would refer the jury to jury instruction twelve, which tracked the model instruction:

> In this case a separate offense is charged against the defendant in each count of the information. Each count charges a separate and distinct offense and the evidence and the law applicable to each count should be considered separately, uninfluenced by your decision as to any other count. The fact that you may find the defendant guilty or not guilty of one of the offenses charged, should not control your verdict as to any other offense charged against the defendant.
>
> The defendant may be found guilty or not guilty of any one or all of the offenses charged.

*See* COLJI-Crim. E:12 (2022).  Defense counsel said this response "ma[de] sense."  Accordingly, the court responded to jury question number two by referring the jury to jury instruction twelve.

### b.  Madison Invited Any Error Regarding Jury Question Number Two

¶ 67    Madison contends that the court's answer to jury question number two was "erroneous and obvious because it was apparent Instruction No. 12 could not clarify the jury's confusion; it did not explain the jury had to find Madison had to attempt to take the life of the named victim."

¶ 68    We conclude that Madison invited any error regarding the court's response to jury question number two because the court adopted the defense's proposed response, and defense counsel expressly agreed with the court's language.

¶ 69    "The invited error doctrine prevents a party from appealing an error that he or she invited or injected into the case." *People v. Butler*, 251 P.3d 519, 522 (Colo. App. 2010).  It "is narrow and applies only to errors in trial strategy but not to errors that result from oversight or attorney incompetence."  *Id.*  "[I]nvited error bars

relief on direct appeal." *People v. Tee*, 2018 COA 84, ¶ 27, 446 P.3d 875, 881.

¶ 70 Defense counsel invites any error in a jury instruction or an answer to a jury question by actively participating in drafting it. *See People v. Jacobson*, 2017 COA 92, ¶¶ 48-52, 474 P.3d 1222, 1230 (holding that defense counsel invited the alleged error by "actively participat[ing]" in drafting the challenged instruction and answer to the jury question and by acquiescing in the instruction); *People v. Hoover*, 165 P.3d 784, 796 (Colo. App. 2006) ("Active participation in the preparation of a response to a jury question, or express agreement with it, bars the participant from arguing that the response constitutes error.").

¶ 71 Even if defense counsel did not actively participate in drafting the challenged jury instruction, the invited error doctrine applies if defense counsel "expressly acquiesce[d]" in it. *Horton v. Suthers*, 43 P.3d 611, 619 (Colo. 2002); *see Butler*, 251 P.3d at 523 (Defense counsel's response to the court's instruction, "That's fine with me," invited the alleged error and precluded the defendant "from claiming on appeal that the court acted in error.").

¶ 72    Because Madison's counsel participated in the formulation of the court's response to jury question number two and then told the court the response "ma[de] sense," we hold that Madison is barred from challenging the response on appeal.  *See Hoover*, 165 P.3d at 796.

### D.    The Prosecution Did Not Commit Misconduct During Closing Argument

¶ 73    Madison contends that the prosecutor committed misconduct during closing argument when she described how an initial aggressor can effectively communicate his or her intent to withdraw from the encounter and thereby establish that his or her use of physical force was justified.  *See* § 18-1-704(3)(b), C.R.S. 2024.  We disagree.

### 1.    Preservation and Standard of Review

¶ 74    "We engage in a two-step analysis when reviewing claims of prosecutorial misconduct."  *People v. Licona-Ortega*, 2022 COA 27, ¶ 85, 511 P.3d 721, 736.  "First, we determine whether the prosecutor's conduct was improper based on the totality of the circumstances."  *Id.*  "Second, we decide whether the misconduct

warrants reversal under the applicable standard." *Id.* at ¶ 85, 511 P.3d at 736-37.

¶ 75     "When determining whether a prosecutor's statements were improper and whether reversal is warranted, we may consider the language used, the context of the statements, the strength of the evidence, whether the prosecutor improperly appealed to the jurors' sentiments, whether the misconduct was repeated, and any other relevant factors." *People v. Liebler*, 2022 COA 21, ¶ 51, 510 P.3d 548, 559.

¶ 76     The parties agree that Madison did not preserve his prosecutorial misconduct argument. *See Licona-Ortega*, ¶ 88, 511 P.3d at 737. And "[p]rosecutorial misconduct rarely constitutes plain error." *People v. Carter*, 2015 COA 24M-2, ¶ 53, 402 P.3d 480, 491.

### 2.     Additional Facts

¶ 77     The prosecutor discussed self-defense and the initial aggressor exception during her initial closing argument. The prosecutor said:

> We discussed this in jury selection as well. If you — I don't want to use the word provoked because that may connote something different legally, but if you started the altercation, if you were the first person to use force in an

altercation, you may not then claim self-
defense unless you communicate to the people
with whom you're engaged in this encounter
that you know what, I'm done. I started this
altercation. Things have escalated to an
uncomfortable level. I'm done. I'm out of here.
If those people then persist in their use of
force, you may then claim self-defense.
Hopefully that makes sense.

Here, of course, our position is that [Madison]
was the initial aggressor. He was the first
person to begin the use of force in this
confrontation.

Defense counsel did not object.

### 3. The Prosecutor Did Not Engage in Misconduct

¶ 78 "[A] prosecutor must have 'wide latitude in the language and presentation style used to obtain justice,'" but "while a prosecutor is 'free to strike hard blows,' she 'is not at liberty to strike foul ones.'" *People v. Buckner*, 2022 COA 14, ¶ 19, 509 P.3d 452, 458 (quoting *Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005)).

¶ 79 "Closing argument may properly include the facts in evidence and the reasonable inferences drawn from those facts, as well as the law on which the jury has been instructed." *Id.* at ¶ 18, 509 P.3d at 458. "[B]ecause arguments delivered in the heat of trial are not always perfectly scripted reviewing courts accord prosecutors

the benefit of doubt where remarks are 'ambiguous' or simply 'inartful.'" *People v. McBride*, 228 P.3d 216, 221 (Colo. App. 2009) (citations omitted) (first quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 646-47 (1974); and then quoting *Domingo-Gomez*, 125 P.3d at 1051).

¶ 80 "A prosecutor must not 'intentionally misstate the evidence or mislead the jury as to the inferences it may draw' from that evidence." *Buckner*, ¶ 18, 509 P.3d at 458 (quoting *Domingo-Gomez*, 125 P.3d at 1049). In addition, "[i]t is improper for counsel to misstate the law or 'misinterpret[] for the jury how the law should be applied to the facts' during closing argument." *People v. Monroe*, 2020 CO 67, ¶ 16, 468 P.3d 1273, 1276 (quoting *People v. Sepeda*, 581 P.2d 723, 732 (Colo. 1978)).

¶ 81 Madison contends that the prosecutor committed misconduct by telling the jury it "could only find Madison withdrew from the altercation if he *verbally* communicated his withdrawal to the three assailants. The prosecutor explained by example Madison had to communicate his withdrawal verbally." We disagree because Madison does not accurately characterize the challenged statement.

¶ 82 First, the prosecutor never said that Madison was required to communicate his withdrawal orally. The prosecutor indeed said that a person who "started the altercation" may not claim self-defense unless the person communicated, "I'm done. I started this altercation. Things have escalated to an uncomfortable level. I'm done. I'm out of here." But the prosecutor said neither that the initial aggressor must convey this message orally nor that the aggressor cannot communicate the message through conduct. The message that the prosecutor described can be expressed either through words or conduct.

¶ 83 Second, the prosecutor did not provide an example of the words Madison needed to utter to inform the victims that he was withdrawing from the altercation. Rather, the prosecutor made the point that any assertion, whether through words or conduct, that communicated, "I'm done. I'm out of here," would signal the person's withdrawal from the altercation. Even if the prosecutor's words were unclear, we do not "lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations."

*People v. Gomez-Garcia*, 224 P.3d 1019, 1025 (Colo. App. 2009) (quoting *Donnelly*, 416 U.S. at 646-47).

¶ 84 Accordingly, the prosecutor's argument was consistent with the statutory "initial aggressor" language. § 18-1-704(3)(b) (providing that a person is not justified in using physical force in self-defense if he is the initial aggressor except that his "use of physical force upon another person under the circumstances is justifiable if he . . . withdraws from the encounter and *effectively communicates* to the other person his . . . intent to do so, but the latter nevertheless continues or threatens the use of unlawful physical force") (emphasis added).

¶ 85 For these reasons, the prosecutor did not engage in misconduct. *See Licona-Ortega*, ¶ 85, 511 P.3d at 736.

E. The Cumulative Error Doctrine Does Not Apply

¶ 86 Generally, errors "afford no grounds for reversal of a judgment where the guilt of the defendant has been clearly proven." *Oaks v. People*, 371 P.2d 443, 445-46 (Colo. 1962). However, we will reverse if the errors "result in 'prejudice to the substantial rights of the defendant.'" *Id.* at 446 (quoting *Cliff v. People*, 269 P. 907, 910 (Colo. 1928)); *see also Howard-Walker v. People*, 2019 CO 69, ¶ 25,

443 P.3d 1007, 1011 ("Stated simply, cumulative error involves cumulative prejudice.").

¶ 87    "[R]egardless of whether any error was preserved or unpreserved," reversal is "warranted when numerous errors in the aggregate show the absence of a fair trial, even if individually the errors were harmless or did not affect the defendant's substantial rights." *Howard-Walker*, ¶ 26, 443 P.3d at 1012; *see also People v. Lucero*, 615 P.2d 660, 666 (Colo. 1980) (reversing the judgment because "the cumulative effect of the[] errors and defects substantially affected the fairness of the trial proceedings and the integrity of the fact-finding process"). "[T]he question is not whether the errors were 'brief' or 'fleeting' but whether, viewed in the aggregate, the errors deprived the defendant of a fair trial." *Howard-Walker*, ¶ 40, 443 P.3d at 1014. "A defendant, although not entitled to a perfect trial, has a constitutional right to receive a fair trial." *People v. Rivera*, 56 P.3d 1155, 1168 (Colo. App. 2002).

¶ 88    We identified at most one error. But as we explained above, defense counsel invited this error, which concerned the court's response to jury question number two. *Supra* Part II.C.2.b. Madison is not entitled to reversal of his conviction based on an

invited error. *See Tee*, ¶ 27, 446 P.3d at 881. In any event, "a single error is insufficient to reverse under the cumulative error standard." *People v. Thames*, 2019 COA 124, ¶ 69, 467 P.3d 1181, 1194.

¶ 89    Thus, we conclude that there is no cumulative error.

### III.    Disposition

¶ 90    The judgment of conviction is affirmed.

JUDGE PAWAR and JUDGE LUM concur.