22CA2075 Peo v Blue 08-07-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA2075
Arapahoe County District Court No. 20CR2765
Honorable Ben L. Leutwyler III, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Mario Nicholas Blue,

Defendant-Appellant.

---

JUDGMENT AFFIRMED IN PART AND VACATED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE BROWN
Dunn and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 7, 2025

---

Philip J. Weiser, Attorney General, Paul Koehler, Senior Counsel, Denver,
Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Leah Scaduto, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Mario Nicholas Blue, appeals the judgment of conviction entered on a jury verdict finding him guilty of several offenses arising from a road rage incident, including attempted first degree murder (extreme indifference), attempted first degree assault (serious bodily injury/deadly weapon), and attempted first degree assault (extreme indifference). Blue contends that (1) insufficient evidence supported his attempted extreme indifference murder conviction or, alternatively, the attempted extreme indifference murder statute is unconstitutionally vague and violates equal protection as applied to him; (2) the district court erroneously admitted unqualified expert testimony; (3) the court erroneously instructed the jury; (4) the prosecutor committed misconduct; and (5) the attempted assault convictions should have been merged into each other and into the attempted murder conviction. Blue also contends that the cumulative effect of these alleged errors requires reversal.

¶ 2    We conclude that the prosecution presented insufficient evidence to support Blue's attempted extreme indifference murder conviction. We also conclude that the attempted assault convictions should merge. As a result, we remand for the district

court to vacate the attempted extreme indifference murder conviction, amend the mittimus, and resentence Blue. We otherwise affirm.

## I. Background

¶ 3    The evidence presented at a three-day trial allowed the jury to find the following facts.

¶ 4    In October 2020, Jesse Carroll was driving home from work on Hampden Avenue in a silver truck when he saw a white sedan driving erratically and blocking two lanes of traffic. Carroll said the sedan had a driver (who was later determined to be Blue) and a passenger (who was never identified). Carroll stopped next to the sedan at a stoplight, yelled "that they drove like shit," and flipped Blue off. Blue swerved towards Carroll, got in front of his truck, and slammed on the brakes. Carroll avoided hitting the sedan by maneuvering between it and a barricade on the right side of the road and passing it.

¶ 5    At some point after that, Blue got in front of Carroll again and was far enough ahead that Carroll thought he could make a right turn onto Jason Street to evade Blue. But in his rearview mirror, Carroll saw Blue back up in traffic to turn and follow him. Blue

2

pulled up next to Carroll's truck at a stop sign, and Carroll saw Blue point a gun at him. As Carroll rolled forward, he heard the gun discharge, and a bullet hit his truck with a loud metal "tink" sound. Then the sedan sped off to the left.

¶ 6 Detective Jessica Moskal, who was a patrol officer at the time of the incident, received a report of an aggressive driver in the area. She saw a white sedan coming from Jason Street and Hampden Avenue at a high rate of speed and pulled it over. The driver identified himself as Blue and said that he had been involved in an altercation with another driver who had thrown something at his car. Blue described the other vehicle as a silver truck and said that he had just been trying to catch up to it. About fifteen to twenty minutes later, the detective received a report that a truck had been shot at and realized the white sedan may have been involved. The detective responded to Carroll's house, inspected the truck, and observed a bullet hole in a toolbox in the truck bed.

¶ 7 Based on these facts, the prosecution charged Blue with reckless endangerment, prohibited use of a firearm, disorderly conduct, menacing, illegal discharge of a firearm, attempted first degree assault (deadly weapon), attempted first degree assault

3

(extreme indifference), attempted first degree murder (extreme indifference), attempted first degree murder (after deliberation), and one crime of violence sentence enhancer. A jury acquitted Blue of attempted murder after deliberation but otherwise convicted him as charged. For the attempted extreme indifference murder count, the district court imposed a controlling sentence of twenty years in the custody of the Department of Corrections. It ordered the sentences on the other counts to be served concurrently.

## II. Sufficiency of the Evidence

¶ 8 Blue contends that the prosecution presented insufficient evidence to sustain his attempted extreme indifference murder conviction. We agree.

### A. Generally Applicable Law and Standard of Review

¶ 9 "Due process requires the prosecution to present sufficient evidence to prove beyond a reasonable doubt every fact necessary to constitute the crime charged." *Johnson v. People*, 2023 CO 7, ¶ 13.

¶ 10 In assessing a challenge to the sufficiency of the evidence, "[w]e review the record de novo to determine whether the evidence before the jury was sufficient both in quantity and quality to sustain the defendant's conviction." *Id.* (quoting *Clark v. People*,

4

232 P.3d 1287, 1291 (Colo. 2010)). We consider "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *Id.* (quoting *Clark*, 232 P.3d at 1291). And in doing so, we "give the prosecution the benefit of every reasonable inference which might be fairly drawn from the evidence." *People v. Harrison*, 2020 CO 57, ¶ 32 (quoting *People v. Perez*, 2016 CO 12, ¶ 25).

B.    The Prosecution Presented Insufficient Evidence to Sustain the Attempted Extreme Indifference Murder Conviction

¶ 11    A person commits extreme indifference murder when, "[u]nder circumstances evidencing an attitude of universal malice manifesting extreme indifference to the value of human life generally, he knowingly engages in conduct which creates a grave risk of death to a person, or persons, other than himself, and thereby causes the death of another." § 18-3-102(1)(d), C.R.S. 2024.

¶ 12    "A person commits criminal attempt if, acting with the kind of culpability otherwise required for commission of an offense, he

engages in conduct constituting a substantial step toward the commission of the offense." § 18-2-101(1), C.R.S. 2024.  A "substantial step" is "any conduct . . . which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense."  *Id.*

¶ 13     Thus, to convict Blue of attempted extreme indifference murder, the prosecution had to prove beyond a reasonable doubt that he "was aware he was engaging in conduct strongly corroborative of the firmness of his purpose to complete the commission of the crime of extreme indifference murder."  *People v. Anderson*, 2019 CO 34, ¶ 18; *see* § 18-2-101(1).  And Blue could only commit the crime of extreme indifference murder if he "caused the death of another by knowingly engaging in conduct creating a grave risk of death to a person or persons other than himself, under circumstances evidencing an attitude of universal malice manifesting extreme indifference to the value of human life generally."  *Anderson*, ¶ 18; *see* § 18-3-102(1)(d); *Montoya v. People*, 2017 CO 40, ¶ 17.

¶ 14     Blue focuses his sufficiency challenge on the "universal malice" element of the offense.  Universal malice has been defined

as conduct objectively demonstrating "a willingness to take human life indiscriminately, without knowing or caring who the victim may be or without having an understandable motive or provocation." *Garcia v. People*, 2023 CO 30, ¶ 16 (quoting *Candelaria v. People*, 148 P.3d 178, 181 (Colo. 2006)). To meet this standard, the defendant's conduct must demonstrate an extreme "lack of care and concern for the value of human life generally." *People v. Jefferson*, 748 P.2d 1223, 1232 (Colo. 1988). This feature of extreme indifference murder is what distinguishes it from, and elevates it in culpability above, second degree murder. *Anderson*, ¶ 15.

¶ 15     Although extreme indifference murder is limited "to situations in which the actor demonstrates an indifference to human life *generally*, as distinguished from indifference to, or willingness to take, *a particular human life*," *Jefferson*, 748 P.2d at 1232 (emphases added), whether a defendant puts one individual at risk or a group of people at risk is not dispositive, *Anderson*, ¶¶ 14-15; *Candelaria*, 148 P.3d at 182. Rather, "the conduct proscribed by the statute could include either acts putting at risk a single person or acts putting at risk more than one person." *Anderson*, ¶ 15. And so long as "the act by which death is knowingly caused, by its

7

very nature or the surrounding circumstances of its commission, objectively evidences" a willingness to take life indiscriminately, it is irrelevant whether a defendant's acts have the "*actual effect* of endangering a number of lives, or even one life, indiscriminately." *Id.* at ¶¶ 14-15.

¶ 16 Blue contends that the prosecution failed to prove the universal malice element of attempted extreme indifference murder when the facts established that he fired one shot at a specific person with whom he had been in a road rage incident. We agree that nothing in the record would allow a reasonable juror to conclude beyond a reasonable doubt that Blue's conduct objectively demonstrated a willingness to take human life *indiscriminately. See Garcia,* ¶ 16; *Anderson,* ¶ 15.

¶ 17 True, the record reflects that Blue was driving erratically, but Blue was not charged with attempted extreme indifference murder for placing random lives at risk through his erratic driving. Instead, as the prosecutor made clear in closing argument, Blue was charged with attempted extreme indifference murder for attempting to cause *Carroll's* death by shooting at him.

¶ 18    Witness testimony established that, once Carroll confronted Blue, Blue focused his aggression on Carroll, reversing in traffic to follow Carroll down a side street, pulling up next to Carroll at a stop sign, and then shooting at Carroll's truck. Although one witness testified that Blue pointed a gun at her too, she was not the named victim of the attempted extreme indifference murder charge, and there was no evidence that Blue shot at her. The prosecution presented no evidence that Blue shot at other people or cars or that the one shot he did fire at Carroll could have possibly hit another person or car. Instead, Blue deliberately fired a single shot at a particular person for a particular reason. *Cf. Montoya*, ¶ 20 (The evidence established attempted extreme indifference murder when the defendant "fired five rounds from the same semi-automatic handgun, indiscriminately, in the direction of a house, full of party-goers."); *People v. Rubio*, 222 P.3d 355, 358-59 (Colo. App. 2009) (By using an AK-47 assault rifle to shoot an empty car, causing "wild shots" to hit nearby occupied residences, the defendant's conduct "reflect[ed] an attitude of universal malice manifesting extreme indifference to human life generally."); *People v. Ellis*, 30 P.3d 774, 778-79 (Colo. App. 2001) ("[A]mple evidence

9

existed to establish" attempted extreme indifference murder when the defendant shot through the doors of a home knowing that it was full of adults and children and testified he was not "directing [his] fire at any particular individual.").

¶ 19     We are not persuaded otherwise by the People's argument that Blue's conduct demonstrated universal malice because he had no understandable motive or provocation, and Carroll was a "total stranger."  Although Blue overreacted and escalated the initial encounter by shooting at Carroll, the evidence clearly revealed his motive — Blue shot at Carroll because Carroll flipped him off and yelled at him.  And although Blue did not know Carroll's name and had not met him before, Carroll was the intended target of the single gunshot Blue fired.  In other words, Blue did not indiscriminately shoot at a random passerby for no reason; he shot at Carroll because Carroll had confronted him.

¶ 20     *Candelaria* and *Anderson,* on which the People rely to argue that a person can engage in conduct evidencing an attitude of universal malice even if they target a single victim, do not compel a different result.  In *Candelaria,*

> there was an abundance of evidence that the defendant and those in his car were specifically searching for [one person] to kill him, [but] there was also evidence that they fired numerous shots in the direction of his vehicle, aware that other people whom they did not know or have grievances against were present in or around the vehicle.

148 P.3d at 183. Based on that evidence, the supreme court concluded that the defendant's conduct demonstrated universal malice and a willingness to take human life indiscriminately. *Id.*

¶ 21   In *Anderson,* the supreme court determined that, by shooting thirteen times in rapid succession at a random deputy who responded to a call, the defendant's conduct

> demonstrated a willingness to take life indiscriminately, either because it objectively evidenced a willingness to kill as many as thirteen bystanders within range of the defendant's indiscriminate shooting, or simply because it evidenced a willingness to kill whoever was pursuing him, in order to draw return fire and be killed himself.

*Anderson,* ¶ 20. There was also "evidence from which the jury could find that the defendant's gunfire was not only capable of reaching, but in fact practically reached . . . the highway from which the defendant had recently turned and upon which he had only minutes before necessarily observed other travelers." *Id.*

11

¶ 22　In contrast to *Candelaria* and *Anderson,* the prosecution presented no evidence that Blue targeted Carroll but nonetheless engaged in conduct that indiscriminately risked other lives. And although Blue's conduct demonstrated an indifference to or willingness to take Carroll's life, it did not demonstrate a willingness to take an unknown life indiscriminately. *See Jefferson,* 748 P.2d at 1232.

¶ 23　Even viewing the evidence in the light most favorable to the prosecution, *see Johnson,* ¶ 13, we cannot conclude that a rational juror could find beyond a reasonable doubt that Blue engaged in the charged conduct "[u]nder circumstances evidencing an attitude of universal malice manifesting extreme indifference to the value of human life generally," § 18-3-102(1)(d). As a result, we must vacate Blue's conviction for attempted extreme indifference murder. *See People v. Mortenson,* 2023 COA 92, ¶ 32 ("Generally, an appellate court vacates a conviction when there is insufficient evidence."). And because we vacate Blue's attempted extreme indifference conviction, we need not address his alternative constitutional challenges.

### III. The Police Officers' Testimony

¶ 24 Blue contends that the district court erred by allowing three police officers to testify about the trajectory of the bullet through Carroll's truck because it was (1) improper expert testimony in the guise of lay testimony and (2) unhelpful. We disagree.

#### A. Standard of Review and Applicable Law

¶ 25 We review a trial court's evidentiary rulings for an abuse of discretion. *Zapata v. People*, 2018 CO 82, ¶ 25. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair or if it misconstrues or misapplies the law. *People v. Liggett*, 2021 COA 51, ¶ 16, *aff'd*, 2023 CO 22.

¶ 26 CRE 701 governs the admission of lay witness testimony. *People v. Stewart*, 55 P.3d 107, 122 (Colo. 2002). Under that rule, a lay witness' testimony is limited to "opinions or inferences" that are (1) "rationally based on the perception of the witness"; (2) "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue"; and (3) "not based on scientific, technical, or other specialized knowledge within the scope of [CRE] 702." CRE 701.

## B. Additional Background

¶ 27    At trial, Carroll was asked to identify the bullet hole in the toolbox that sat in the bed of his truck, up against the cab. He also described the "entry hole of a bullet" below the back cab window that formed "a pretty straight line" from the bullet hole in the toolbox. And he explained that the driver's headrest sat "flush against" the cab window. When the prosecutor asked about a "black dot" in the center of the headrest, Carroll explained that part of the interior trim of the truck had been fractured from the bullet, "and it caused the plastic to chip off, cutting that little cut into the back of the headrest." When the prosecutor asked Carroll if he was "saying that when the bullet went through the cab[,] . . . it actually came through and damaged the back of the headrest," Carroll responded affirmatively.

¶ 28    Without being qualified as experts, three police officers also testified about their observations of the damage to Carroll's truck and the remnants of a bullet found inside.

¶ 29    First, Officer Logan Wynder testified that he was dispatched to Carroll's home and inspected "the trajectory of the bullet and all the damage" to the truck. Officer Wynder said that "[t]he bullet was

coming from the left side, going right" and that "[i]t hit the corner side of the toolbox, continued and went out of the toolbox, into the truck near the back window, through that frame, and into the backseat of where the driver would be sitting."  The officer confirmed that his testimony was "just based on observing where the bullet holes were."  He also said that other officers found "fragments of the bullet inside the vehicle."

¶ 30  Second, Detective Moskal testified that she inspected Carroll's truck at his home following the incident and that he "pointed out a bullet hole" in the toolbox in the bed of his truck "that traveled through the toolbox and into the driver's headrest."

¶ 31  Third, Detective Bryan Penry testified that he also inspected Carroll's truck that day.  He found "shavings" or "fragments of [the] bullet[] on the floorboard and the seat, as well as damage to the back of the . . . driver's headrest."  After removing the headrest cover, the detective saw "a silver mark" on the black metal of the headrest "from where the bullet struck."  During cross-examination, defense counsel asked Detective Perry if he could tell the jury how a bullet trajectory analysis is done.  The detective responded that he

15

had "limited training on that" and that he was not "sure exactly how they measure" the angle since he had "done it very few times."

¶ 32    Defense counsel did not object to any of this testimony.

    C.    The Officers' Testimony Was Not Expert Testimony

¶ 33    Blue contends that the district court erred by allowing the three police officers to give unqualified expert testimony in the guise of lay testimony that the bullet made the mark on the driver's seat headrest.  We are not persuaded.

¶ 34    "[T]he critical factor in distinguishing between lay and expert testimony is the basis for the witness's opinion."  *Venalonzo v. People*, 2017 CO 9, ¶ 22.  We "must consider whether the testimony could be based on an ordinary person's experience or knowledge."  *People v. Murphy*, 2021 CO 22, ¶ 21.  If so, it is proper lay opinion testimony if it meets the requirements of CRE 701.  *Id.* at ¶¶ 17, 20.  But if a "witness provides testimony that could not be offered without specialized experiences, knowledge, or training, then the witness is offering expert testimony" under CRE 702.  *Venalonzo*, ¶ 2.

¶ 35    "Police officers regularly, and appropriately, offer testimony under CRE 701 based on their perceptions and experiences."

16

*People v. Tallwhiteman*, 124 P.3d 827, 832 (Colo. App. 2005); *accord Murphy*, ¶ 21. An officer's testimony only "becomes objectionable when what is essentially expert testimony is improperly admitted under the guise of lay opinions." *Stewart*, 55 P.3d at 123.

¶ 36    The officers' testimony — essentially, that the bullet struck the toolbox on Carroll's truck, traveled through the cab frame, and hit the headrest, leaving a mark — was based solely on what they observed when they inspected the truck. No evidence suggests that the officers measured the bullet holes or calculated the bullet's trajectory to determine that the bullet hit the headrest. Neither Detective Moskal nor Officer Wynder said they had any special training or experience analyzing a bullet's trajectory, while Detective Penry said he had "limited training" in that area but admitted he did not know how to measure the bullet's angle. *See Venalonzo*, ¶ 22. Any ordinary person could have made the observations and given the opinions the officers gave. *See Murphy*, ¶ 21; *Venalonzo*, ¶ 22. Indeed, Carroll reached a similar conclusion based on his own observations.

¶ 37    We reject Blue's assertion that the officers had to personally observe the bullet being fired at Carroll's truck to be able to testify

17

as they did.  Under CRE 701, the officers could relay "opinions or inferences" that were "rationally based on [their] perception[s]."  *See also Tallwhiteman,* 124 P.3d at 832.  And their opinions were rationally based on their perceptions of the bullet holes and damage to the truck and on the bullet fragments found on the floor of the cab.  Thus, we conclude that the court did not abuse its discretion by admitting the officers' testimony as lay testimony.  *See* CRE 701; *see also People v. Caldwell,* 43 P.3d 663, 667 (Colo. App. 2001) (concluding that a former police officer working as a crime scene technician gave proper lay testimony about the path of two bullets through a car because the testimony was based "only [on] his observations about the entry locations of the bullets and the path they traveled inside the vehicle," which were observations that "could just as easily have been made by the jury from the photographs").

### D. The Officers' Testimony Was Helpful

¶ 38  Blue alternatively contends that the district court erred by admitting the officers' testimony under CRE 701.  Specifically, he argues that the testimony was not helpful because "the witnesses were in no better position than the jurors to evaluate the evidence."

But each of the three officers inspected the truck in person, whereas the jurors only viewed photographs of the bullet holes and vehicle damage. *See People v. Vigil*, 2015 COA 88M, ¶ 67 (concluding that a sergeant was not in the "very same position as the jurors" because, unlike the jurors, "he personally observed the shoeprints at the scene"), *aff'd*, 2019 CO 105. Based on their personal observations of Carroll's truck, the officers *were* in a better position to give an opinion about the bullet's trajectory than the jurors. Accordingly, we conclude that the court did not abuse its discretion by concluding that the officers' testimony was helpful to the jury. *See* CRE 701; *see also Zapata*, ¶ 25; *Liggett*, ¶ 16.

## IV. Jury Instruction

¶ 39 Blue contends that the district court erroneously instructed the jury that it could only draw inferences from facts that were proved, not from the absence of evidence. We perceive no error.

### A. Generally Applicable Law and Standard of Review

¶ 40 The district court has a duty to accurately instruct the jury concerning the controlling law. *Riley v. People*, 266 P.3d 1089, 1092 (Colo. 2011). We review de novo whether the jury instructions, considered as a whole, correctly stated the law. *People*

19

*in Interest of J.G.*, 2016 CO 39, ¶ 33.  But "[w]e review a trial court's decision whether to give a particular jury instruction for an abuse of discretion."  *People v. Cline*, 2022 COA 135, ¶ 32.  A court abuses its discretion when its ruling results in a misstatement of the law or is manifestly arbitrary, unreasonable, or unfair.  *J.G.*, ¶ 33.

## B.    The District Court Did Not Erroneously Instruct the Jury

¶ 41    Without objection, the district court gave the jury the following instruction offered by the prosecution (Instruction No. 4):

> The evidence in this case consists of the sworn testimony of all witnesses and all exhibits which have been received in evidence.

> You are to consider only the evidence in this case and reasonable inferences therefrom.  An inference is a deduction or conclusion which reason and common sense lead the jury to draw from facts that have been proved.

¶ 42    Blue contends that Instruction No. 4 misstated the law and the burden of proof by (1) telling the jury that it could only draw inferences from "facts that have been proved" by direct evidence, not from circumstantial evidence or from the lack of evidence; and (2) not identifying a standard or burden by which the jury could determine that the facts had been proved.  For three reasons, we

conclude that Instruction No. 4 did not misstate the law or the burden of proof.

¶ 43 First, the instruction did not erroneously preclude the jury from drawing inferences from the lack of evidence. "[T]he absence of an express instruction to consider the lack of evidence is not tantamount to a prohibition on doing so." *People v. Melara*, 2025 COA 48, ¶ 32 (concluding that a reasonable doubt instruction that did not refer to the lack of evidence did not impermissibly lower the prosecution's burden of proof); *accord People v. Schlehuber*, 2025 COA 50, ¶¶ 19-20 (concluding that a court does not err by omitting "lack of evidence" language from the reasonable doubt instruction). Instruction No. 4 "did not forbid or even dissuade the jurors from applying their common sense when considering the evidence in this case, including issues or requirements that the evidence failed to address." *Melara*, ¶ 31; *accord Schlehuber*, ¶ 21 ("[T]he concept of reasonable doubt inherently invites jurors to consider what evidence is missing."). And before the court read Instruction No. 4, it had already correctly instructed the jury that reasonable doubt means, in relevant part, "a doubt based upon reason and common sense which arises from a fair and rational consideration of all of

the evidence, *or the lack of evidence*, in the case." (Emphasis added.) *See* COLJI-Crim. E:03 (2021) (model jury instruction for presumption of innocence, burden of proof, and reasonable doubt). So, the court *did* expressly instruct the jury that it could consider the lack of evidence, albeit in a separate instruction. *See Johnson v. People*, 2019 CO 17, ¶ 14 ("We do not consider jury instructions in isolation; rather, we consider them 'in the context of the instructions as a whole . . . .'" (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991))).

¶ 44 Second, the instruction did not prohibit the jury from considering circumstantial evidence. The instruction did not reference or distinguish between direct and circumstantial evidence. Separately, the court correctly instructed the jury that "[a] fact may be proven by either direct or circumstantial evidence. Neither is necessarily more reliable than the other." And it defined direct evidence as "first-hand observation of the fact in question" and circumstantial evidence as "based on observations of related facts that may lead you to reach a conclusion about the fact in question." The instructions collectively informed the jury that it could base its verdict on circumstantial evidence. *See id.*

¶ 45    Third, although Instruction No. 4 itself did not identify a burden or standard of proof, the balance of the instructions collectively made clear that the prosecution alone bore the burden to prove beyond a reasonable doubt each element of the charged crimes. *See id.* The court instructed the jury that "[e]very person charged with a crime is presumed innocent. This presumption of innocence remains with [Blue] throughout the trial and should be given effect by you unless, after considering all of the evidence, you are then convinced that he is guilty beyond a reasonable doubt." It informed the jury that "[t]he burden of proof is upon the prosecution to prove to the satisfaction of the jury beyond a reasonable doubt the existence of all the elements necessary to constitute the crime charged." It correctly defined reasonable doubt. And it told the jury that "[n]o single instruction describes all the law which must be applied; the instructions must be considered together as a whole."

¶ 46    Thus, we conclude that the instructions, as a whole, correctly stated the law, and the court did not abuse its discretion by giving Instruction No. 4. *See J.G.,* ¶ 33.

## V.    Prosecutorial Misconduct

¶ 47    Blue contends that the district court plainly erred when it allowed the prosecutor to commit misconduct during closing argument by (1) evoking racist stereotypes; (2) exploiting "erroneous" Instruction No. 4; and (3) providing expert testimony. We disagree.

### A.    Standard of Review

¶ 48    We engage in a two-step analysis when reviewing claims for prosecutorial misconduct. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we determine whether the prosecutor's conduct was improper based on the totality of the circumstances. *Id.* Second, we decide whether such actions warrant reversal under the proper standard. *Id.*

¶ 49    We review unpreserved claims of prosecutorial misconduct under the plain error standard. *People v. McMinn*, 2013 COA 94, ¶ 58. "To constitute plain error, prosecutorial misconduct must be flagrant or glaringly or tremendously improper, and it must so

24

undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." *Id.*[1]

## B.   Racist Stereotypes

¶ 50   Blue contends that the prosecutor evoked racist stereotypes during closing argument by describing Blue as "hunting" Carroll. We are not persuaded.

### 1.   Additional Background

¶ 51   During closing, while arguing that Blue eventually directed his aggressive driving at Carroll, the prosecutor told the jury that Blue

---

[1] Blue argues that we should review claims of prosecutorial misconduct that evoke racist stereotypes de novo and automatically reverse regardless of preservation. He points to a recent case in which the Washington Supreme Court reviewed unpreserved claims of race-based prosecutorial misconduct de novo and imposed an automatic reversal rule due to the grave violation that occurs when a "prosecutor resorts to racist argument and appeals to racial stereotypes or racial bias to achieve convictions." *State v. Bagby*, 522 P.3d 982, 990-97 (Wash. 2023) (citation omitted). We note that the Washington Supreme Court determined that a prosecutor's race-based misconduct requires automatic reversal "when a prosecutor *flagrantly or apparently intentionally* appeals to racial bias in a way that undermines the defendant's credibility or the presumption of innocence." *Id.* at 990. That standard is not all that different from how we determine whether to reverse for prosecutorial misconduct under plain error review. *See People v. McMinn*, 2013 COA 94, ¶ 58. But because we conclude that the prosecutor's conduct was not improper, we need not determine whether automatic reversal would be appropriate.

reversed "in oncoming traffic, he back[ed] up his car far enough that he c[ould] make that turn onto Jason and start his hunt over again."  A few minutes later, while arguing that Blue's actions evidenced an attitude of universal malice, the prosecutor said that "[a]fter driving, after hunting, [Blue] took the shot."  She continued,

> So either you believe that he deliberately wanted to kill [Carroll] by taking that shot, by hunting him down, or you have to at least believe that he took the shot knowing what happens when a bullet hits a human, knowing the danger a gun can cause, knowing what a firearm is.

### 2. Analysis

¶ 52    Blue argues that the prosecutor's characterization of Blue's conduct as "hunting" Carroll "tap[ped] into deep-seated racial prejudices dehumanizing Black people" because words "commonly associated with animals . . . can 'activate the juror's mental association' with racial stereotypes, including the stereotype of Black people as animalistic and . . . 'the super-predator trope.'" (Citation omitted.)  He argues that the prosecutor inflamed the passions of the jury by invoking "some of the most damaging and pernicious stereotypes that have historically infected American society and undermined confidence in the criminal justice system."

26

¶ 53    To be sure, racism in the justice system cannot be tolerated. *See Peña-Rodriguez v. Colorado*, 580 U.S. 206, 224 (2017) ("[R]acial bias" is "a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice."). But Blue does not point us to anything in the record beyond the prosecutor's use of the word "hunt" to demonstrate that she attempted to evoke racist stereotypes.[2]

¶ 54    While prosecutors may not use arguments calculated to inflame the passions and prejudices of the jury, they must be given wide latitude during closing argument to "refer to the strength and significance of the evidence, conflicting evidence, and reasonable inferences that may be drawn from the evidence." *People v. Carter*, 2015 COA 24M-2, ¶¶ 70-71 (quoting *People v. Walters*, 148 P.3d 331, 334 (Colo. App. 2006)). The common meaning of the word "hunt" is "to pursue with intent to capture" or "search out." Merriam-Webster Dictionary, https://perma.cc/R6FE-SLFA. And

---

[2] The only other portion of the record that Blue cites to support this argument is the testimony of Stephanie Strand, who described Blue as driving "slouched down really low" with his hat low. Blue argues that Strand's testimony was racist, but Strand's testimony is not the prosecutor's conduct, and the prosecutor did not reference this portion of Strand's testimony.

here, the evidence established that after Carroll yelled at Blue and flipped him off, Blue targeted Carroll. Carroll tried to get away from Blue, but Blue chased Carroll down — including by reversing in traffic to follow Carroll down a side street. Once Blue caught Carroll, he shot at him. Viewing the prosecutor's statements "in the context of the argument as a whole and in light of the evidence before the jury," *McMinn*, ¶ 60, we do not see her use of the term "hunt" as an improper attempt to inflame the passions of the jury by evoking racial stereotypes.

### C.    Jury Instruction

¶ 55    Blue contends that the prosecutor (1) exploited "erroneous" Instruction No. 4 by telling the jury that it could not consider his theory of defense without direct evidence that the passenger shot the gun and (2) lowered and shifted the prosecution's burden of proof to him. We reject these contentions.

#### 1.    Additional Background

¶ 56    During rebuttal closing argument, the prosecutor reminded the jury that it was her burden to prove the case beyond a reasonable doubt. She told the jurors they "[could ]not speculate about evidence that [they] did or did not hear; [they] c[ould] only

28

look at the evidence [they] ha[d]." She said, "There is no evidence that the passenger in this case ever touched a gun. In fact, the evidence you have is that Mario Blue, the defendant, pointed a gun at the victim and shot it." She also told the jury it could not "speculate as to what [the passenger] could have said or what his role may have been because there[] [was] no evidence of that." The prosecutor argued it would be "unreasonable to look at the victim, to look at his car, to look at the physical evidence, and say the victim was never shot at. The only other way that that bullet could have been there there's no evidence of."

## 2. Analysis

¶ 57 We have already concluded that Instruction No. 4 did not erroneously prohibit the jury from drawing inferences from circumstantial evidence or the lack of evidence. Even so, the challenged remarks were not tied to Instruction No. 4 at all. The prosecutor did not discuss the types of evidence the jury could draw inferences from or suggest that the jury could not consider Blue's defense because it was not based on direct evidence. So we fail to see how the prosecutor "exploited" Instruction No. 4.

¶ 58    Instead, after reminding the jury that it was her burden to prove the charges beyond a reasonable doubt, the prosecutor simply argued that there was no evidence to support Blue's theory of defense that the passenger was the shooter. She did not argue that Blue was required to offer evidence to support his theory, only that the jury should not speculate to find a reasonable doubt. *See* COLJI-Crim. E:03 (2021). Viewing the prosecutor's remarks in context, we conclude that they did not lower or shift the burden of proof. *See People v. Strock*, 252 P.3d 1148, 1154-55 (Colo. App. 2010) (a prosecutor's comments on the lack of evidence supporting a defendant's theory did not improperly shift the burden of proof). Accordingly, we perceive no error, let alone plain error. *See McMinn*, ¶ 58.

## D.    Expert Testimony

¶ 59    Blue contends that the prosecutor gave improper expert testimony in closing argument by (1) discussing the witnesses' inability to identify Blue because they were focused on the gun and (2) arguing that the bullet "disintegrated" in the headrest. We disagree.

### 1. Witness Perception

¶ 60    During closing, the prosecutor argued that inconsistencies in the witnesses' ability to identify Blue after the incident related to whether each witness was distracted by a gun:

> [T]he difference between Caitlin Rasmussen, who was able to identify [Blue] from a lineup, and Jesse Carroll and [Stephanie] Strand is the presence of a gun. Because, when [Strand] was looking at the driver, she looked down and she saw the driver holding that gun, and that's where her focus went to. When Jesse Carroll saw that driver holding a gun, that's where his focus went to.

¶ 61    Blue argues that the prosecutor's comments were improper because they were not supported by expert testimony at trial yet implied "the results of social science research, and there was no reason to believe average jurors would be knowledgeable about the effects a weapon has on eyewitness perception and memory." But the prosecutor did not suggest that her explanation was grounded in research the jury had not heard. And arguing that a witness may not be able to focus on anything but a gun being pointed at them is not outside the realm of an average person's experience. *See Murphy*, ¶ 21; *Venalonzo*, ¶ 22; *cf. People v. Davis*, 280 P.3d 51, 54 (Colo. App. 2011) (concluding that the prosecutor committed

misconduct during closing argument by discussing the stages of rape trauma syndrome when no such evidence was presented at trial and the prosecutor's detailed argument implied that he had specialized knowledge and expertise). Accordingly, the prosecutor's statements were not improper. *See McMinn*, ¶¶ 59-60.

### 2. "Disintegrate"

¶ 62      While discussing the bullet fragments found in Carroll's car, the prosecutor said,

> [Carroll] said he was shot, and that's the bullet hole (indicating). That bullet hole goes through . . . the toolbox, through the cab, into the back of the driver-side headrest where his head is; so far in with enough strength that it is still managing to damage that metal. Eventually, it would disintegrate, leaving evidence of bullet fragments. That corroborates that he was shot.

¶ 63      Blue contends that the prosecutor's remarks were not rooted in the evidence, but two police officers testified that there were bullet fragments and shavings found inside Carroll's truck. The prosecution also admitted photo exhibits of the bullet shavings. Thus, the prosecutor's remarks were based on the evidence presented at trial. *See Carter*, ¶ 71.

¶ 64    Blue also contends that the prosecutor's statement that "the bullet disintegrated in the headrest was not common sense," but it was clear from the witness testimony and the exhibits that the bullet had split apart in some way.  And multiple witnesses testified that the bullet hit the headrest.  The prosecutor's choice of the word "disintegrate" to describe that evidence was not based on specialized knowledge or expertise; it was, at most, oratorical embellishment.  *See id.* at ¶ 70.  Accordingly, we perceive no improper conduct.  *See McMinn,* ¶¶ 59-60.

## VI.    Merger

¶ 65    Blue contends that the attempted assault (deadly weapon) conviction and the attempted assault (extreme indifference) conviction should have merged into each other and into the attempted extreme indifference murder conviction because they were all based on the same act against the same victim.  *See People v. Moore,* 877 P.2d 840, 845 (Colo. 1994).  The People do not dispute that merger is required.  Although we have vacated the attempted extreme indifference murder conviction, we agree that the assault convictions should merge with each other because they were based on the same act against the same victim.  *See id.*  We

33

remand the case for the district court to amend the mittimus accordingly.

## VII. Cumulative Error

¶ 66    Blue contends that, even if the alleged errors do not individually require reversal, their cumulative prejudicial impact does. But because we have found no error, the cumulative error doctrine does not apply. *See Howard-Walker v. People*, 2019 CO 69, ¶ 25 ("For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not."); *People v. Shanks*, 2019 COA 160, ¶ 76 (cumulative error doctrine only applies when multiple errors were committed, not merely alleged).

## VIII. Disposition

¶ 67    We vacate the attempted extreme indifference murder conviction and remand the case to the district court to merge the assault convictions, amend the mittimus, and resentence Blue. We otherwise affirm the judgment of conviction.

JUDGE DUNN and JUDGE SCHOCK concur.

34